SOUTHEASTERN MAIL TRANSPORT, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; TONY E. DAVIS AND PATRICIA M. DAVIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Southeastern Mail Transport, Inc. v. Commissioner
Docket Nos. 703-81, 732-81.
United States Tax Court
T.C. Memo 1987-104; 1987 Tax Ct. Memo LEXIS 100; 53 T.C.M. (CCH) 217; T.C.M. (RIA) 87104; February 23, 1987. *100 Held: Petitioners Davis, not petitioner Southeastern Mail Transport, Inc., purchased during 1977 12 tractors; petitioner, Southeastern Mail Transport, Inc., is not entitled to investment tax credits on tractors purchased and resold and is taxable on gain from such sales; petitioners are not entitled to include in the basis of certain tractors and trailers interest on the deferred portion of the purchase price or in the gross proceeds of sale accrued interest on the deferred sale price; petitioners Davis are taxable on a $25,000 bonus. Jones E. Davis, for the petitioners. Max K. Boyer, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in the income tax liability of Southeastern Mail Transport, Inc. (SMT), docket No. 703-81, in the amounts for the fiscal years as follows: Fiscal Year Ended
Amount
June 30, 1978
$20,167.38
June 30, 1979
88,587.49
The deficiencies determined against petitioners Tony E. Davis and Patricia M. Davis in docket No. 732-81 are in the following amounts for the calendar years indicated: Year
Amount
1977
$19,699.81
1978
14,105.32
1979
13,204.15
Most of the issues arise out of the operation, initially by *101 Mr. Davis as sole proprietor and thereafter by SMT, his wholly owned corporation, of long-haul mail delivery service pursuant to contracts with the United States Postal Service (Postal Service). More specifically the issues are: (1) As to twelve specific tractors whether Mr. Davis or SMT is entitled to investment tax credit; [1]
(2) as to eight Peterbilt, six Freightliner and the twelve tractors referred to in (1) whether SMT is entitled to investment tax credit; (3) whether petitioners are entitled to capitalize *102 both stated and unstated finance charges (i.e., interest) payable on the purchase price of tractors, trailers, and one automobile and (where applicable) receivable on resales of tractors or whether the interest should be treated as currently deductible from and includable in gross income; (4) whether SMT sold eleven tractors in fiscal 1979 (eight Peterbilt tractors and three Freightliner tractors) for additional gain in the amount of $25,112.23; [2]
(5) whether SMT is entitled to deductions for certain traffic violations on account of overloaded trailers; and (6) whether petitioners Davis are taxable on a $25,000 bonus allegedly paid by SMT to Mr. Davis *103 in 1979. Respondent raised by amendment to his answer certain alternative issues including liability for addition to tax for negligence under section 6653(a) [3] but we do not reach these alternatives. FINDINGS OF FACT General
Some of the facts have been stipulated and they are so found. Petitioners Davis, who during all of the periods involved were husband and wife, were residents of Jacksonville, Florida, at the time the petition was filed in docket No. 732-81. They filed joint Federal income tax returns on the calendar year basis. SMT, petitioner in docket No. 703-81, was incorporated under the laws of the State of Florida on August 17, 1977. At the time its petition was filed, its principal office was in Jacksonville, Florida. It filed its Federal income tax returns on a June 30 fiscal year. All of the issued and outstanding stock of SMT was owned by Mr. Davis who was its president and treasurer and its chief executive officer throughout the years involved. The business of SMT was the transportation of United States mail under contract with the Postal Service. *104 Mr. Davis commenced this business as a sole proprietor during the first half of 1977. SMT was organized by him for the purpose of taking over this sole proprietorship, which it did effective upon its incorporation on August 17, 1977. However, for bookkeeping and tax reporting purposes, SMT was treated as having commenced operation on July 1, 1977. Respondent has not questioned this allocation of income and expense; accordingly, for the purposes of this case, we accept it. During 1977, all of the contracts for the transportation of mail with the Postal Service were entered into by Mr. Davis individually. To avoid problems and costs associated with the assignment of these contracts to SMT when that corporation commenced business on August 17, 1977, and as a part of the incorporation proceedings, Mr. Davis entered into a Declaration of Trust. This document recites that eleven specifically described trailers, [4] which were subject to lease-purchase agreements with the manufacturers or dealers or were registered in Mr. Davis' name subject to liens, were acquired for the hauling of bulk mail in order to carry out four transportation services contracts with the Postal Service entered *105 into in May, June, and July 1977, (and presumably earlier contracts, if any), all in contemplation of the formation of SMT to conduct the business. Accordingly, the Declaration of Trust recites that the trailers and equipment are held in trust for the use and benefit of SMT. The parties have stipulated to all the facts necessary to recalculate the basis, interest expense (both stated and unstated), short-term capital gain and interest income, or in some instances petitioners have failed to object in any fashion to the calculations *106 in the statutory notice. In effect the parties have agreed to calculations which permit redetermination of the tax liability of the two sets of petitioners in light of our opinion on the various issues. We need not, therefore, discuss the stipulated calculations in any detail in this proceeding. In years subsequent to the years before the Court, the Postal Service cancelled the mail-hauling contracts with SMT. Ultimately most, if not all, of the equipment was repossessed by the finance company or manufacturer. SMT ceased active business in a later year. There were business advantages to Mr. Davis and SMT for the tractors to be owned by driver-operators who were treated as independent contractors. However, the Postal Service regulations required that Mr. Davis or SMT as the contract hauler own and operate approximately 50 percent of the tractors. Thus, some of the tractors which were used were owned by or leased to SMT for its use in the hauling of mail whereas other tractors, acquired either by Mr. Davis or by SMT, were the subject of agreements to sell with individual drivers, the owner-operators. [5] In general the length of the mail hauling run determined the type of tractor *107 used. Some overnight trips required a tractor large enough for two drivers with sleeping accommodations. Where the Postal Service contracts were expected to be indefinite in duration or approximating 2 years in length, SMT usually preferred to purchase tractors suitable for the particular trip (some of which would be resold to owner-operators). Short term contracts on the other hand, were generally serviced with leased tractors. All of the trailers were owned by or leased to SMT (or to Mr. Davis). Issue 1
During the year 1977, Mr. Davis purchased twelve tractors, seven of which were *108 manufactured by General Motors Corporation, four by Mack Trucks, and one by International Harvester Corporation. Each of these tractors was titled and registered in Mr. Davis' name. [6] The record contains what purports to be copies of each of the twelve purchase contracts, all of which are on the installment basis, but none of the stipulated documents is complete. [7] *110 There are several forms used which are slightly different but the differences are immaterial to our decision. Each contract provides for a down payment, in general approximately 10 percent of the cash purchase price which is stated in every case on the face of the contract. Each contract includes a separately stated finance charge, in certain of the cases with a specific interest rate stated. The contracts all specify the total of the payments, sometimes described as the "time balance" which is simply the aggregate of the amount financed and the finance charge. Some contracts also set forth specifically the deferred payment price, the sum of the down payment, the amount financed, and the finance charge. Six of the tractors were purchased in early July 1977; two of the purchase agreements have no date; and the remaining *109 four agreements are dated in September, October, and December 1977, after the incorporation of SMT. Mr. Davis in his own name entered into agreements to sell each of these twelve tractors with an owner-operator described as the "buyer." The agreements to sell are in some instances dated the same day as the purchase agreement or a few days thereafter. In other instances several weeks intervened between the date of the purchase contract (where we have that date) and the date of the agreement to sell. In one instance, the agreement to sell antedates the purchase agreement. None of these twelve tractors appeared to have been utilized at all by Mr. Davis during the term of his sole proprietorship. [8] Petitioners Davis on their 1977 income tax return claimed investment tax credit on each of these twelve tractors. The credit was computed on the deferred payment price, including the aggregate interest payable over the installment period. They also reported on their return short-term capital gain on the resale of each of these tractors during the year 1977 to owner-operators. Each of the agreements to sell was also on the installment basis with a deferred payment price. The short-term capital gain reflected the aggregate of the deferred payment price of each of the twelve tractors, [9] that is the total interest payable by owner-operators was treated as gross proceeds of sale. Petitioners *111 Davis did not claim any depreciation on these tractors. Their 1977 income tax return is dated April 14, 1978, and there is nothing in this record to indicate it was not a timely-filed return. In their original petition in this case (docket No. 732-81) filed on January 14, 1981, petitioners in paragraph (5)(b) alleged that "petitioners were the legal owner of several truck tractors and therefore were entitled to claim investment tax credit in the year of purchase of said equipment." In April 1981, petitioners Davis filed an amended Federal income tax return for the calendar year 1977. The explanation for the filing of this amended return is as follows: Schedule "D" filed with the 1977 Federal Income tax return showing a short-term gain on equipment in the amount of $75,440.25 was in error. There was no change of ownership of said equipment. On October 17, 1984, after the notice of trial was served, petitioners Davis filed an amended petition in which they alleged that "Tony E. Davis purchased and held said equipment [the twelve tractors] as an agent for" SMT. The statutory notice was issued on October 16, 1980. *112 Issue 2, 3 and 4
Eight Peterbilt tractors and nine Freightliner tractors were purchased by SMT during its 1979 fiscal year. [10] *113 During the same fiscal year, SMT entered into agreements to sell with various owner-operators covering the eight Peterbilt tractors and three of the nine Freightliners. Agreements to sell with respect to three more of the Freightliners were entered into during July 1979, the first month of SMT's 1980 fiscal year, which year is not before the Court. The remaining Freightliners were apparently placed in service by SMT during its 1980 fiscal year. Each purchase of these seventeen tractors was on an installment basis with a cash down payment. There are three separate sets of agreements to sell pertaining to the eight Peterbilt tractors, the six Freightliner tractors, and the twelve tractors of different makes purchased by Mr. Davis in 1977. There are, however, two basic preprinted forms, in one of which the name "Tony E. Davis" appears in the preprinted part of the form as the seller and in the other form the name "Southeastern Mail Transport, Inc." is preprinted as the seller. All of the preprinted provisions in the Tony E. Davis agreements to sell appear to be identical with each other and the same is true of the SMT forms of agreements to sell. [11] *114 Where the two forms of agreements to sell have parallel provisions, the verbiage appears to be identical except as noted herein. Each set of forms includes the name of the owner-operator who is described as the "buyer," a detailed description of the particular tractor which is subject to the agreement, the purchase price which is the cash price, the finance charge with a specified rate of interest, and the time balance. In the Tony E. Davis forms the agreements provide for a down payment although as completed some of those contracts show that no down payment was in fact *115 made. The SMT form of agreement to sell does not even provide for a down payment. The resale price of each tractor is higher than the cost to Mr. Davis or SMT as reflected in the applicable deferred purchase contract. In each agreement to sell, the installments are payable every 28 days which apparently coincided with the payment schedules established by the Postal Service. Each agreement to sell recites that title to the tractor remains in the name of seller. However, in many instances, legal title was actually retained by the manufacturer or the finance company as security for the purchase price payable by Mr. Davis or SMT. Each agreement recites that the seller is entitled to retain "for tax reporting purposes" all investment tax credits. The agreements provide that the buyer is to take possession upon execution of the agreement and that the buyer assumes all liability for insurance, taxes, maintenance, upkeep and the cost of operating the tractor. Possession appears to have been actually delivered to each owner-operator although we cannot determine whether delivery occurred at the time of or before or after the signing of the agreement to sell. The agreements specify that *116 time is of the essence, that if the buyer fails to pay any installments or otherwise breaches the agreement, the entire unpaid balance becomes due, that the seller thereupon may repossess the tractor and sell it at public or private sale, all in accordance with the Uniform Commercial Code of the State of Florida. The Tony E. Davis form includes reference to a separate hauling contract between SMT and the buyer (i.e., the owner-operator). It recites that the hauling contract includes a provision authorizing SMT to withhold the sum of $500 out of every due payment to the owner-operator to be placed in a maintenance fund to cover major repairs to the tractor. In the agreement to sell the owner-operator assigns this maintenance fund to the seller. [12] *117 Each agreement to sell is "deemed a security agreement" under the Uniform Commercial Code with additional Uniform Commercial Code covenants as an exhibit to the agreement. The record includes copies of some hauling contracts which in general specify the obligations of the owner-operator with respect to hauling the loaded trailer and observing a prescribed time schedule, and specify the fixed sum payable to the owner-operator for each round trip. The hauling contracts also recite that the owner-operator is liable for maintenance, collision and comprehensive insurance, highway use taxes, loss, damage, or destruction to the trailers to the extent not covered by insurance, and other costs, fees, charges, and expenses. The owner-operator is made responsible for the manner in which the hauling schedule is performed, the uses to which the tractor is put, and similar matters. The hauling contracts are in general consistent with provisions expected to be found in contracts of this kind with independent contractors. Few if any of the owner-operators had either the necessary funds or credit to have purchased these tractors from the manufacturer. In many instances, the owner-operators did not have the funds to pay for their maintenance and operating expenses which forced SMT to advance funds against the fixed payments for the hauling *118 of the mail. There was also a high turnover in owner-operators. In some cases one owner-operator would transfer his agreement and his equity in the tractor to another owner-operator; in other cases the owner-operator simply turned the tractor back to SMT in its then existing condition. Although the agreements to sell gave Mr. Davis or SMT remedies against the owner-operators for defaults such as for failure to maintain the tractors or to reimburse SMT for advances, in no case were any of such remedies exercised. The owner-operators appear to have been judgment proof and efforts to enforce the contracts against them would probably have been fruitless. Thus, in many instances SMT did not recover sums advanced to or for the benefit of owner-operators. Although the agreements to sell obligated the owner-operators to take out and pay for insurance, SMT appears to have obtained insurance policies itself and to some extent have allocated to the owner-operators a pro rata part of the premium costs. The parties have stipulated that the eight Peterbilt tractors were placed in service in the month of acquisition by SMT but there is no contention that these tractors were used by SMT for its *119 own account prior to entering into the agreements to sell with the owner-operators. There is no stipulation or evidence in the record as to when the six Freightliners (as to which the investment tax credit is in controversy) or the twelve Davis tractors were placed into service; neither is there any contention by petitioners that Mr. Davis or SMT used any of these tractors in their respective businesses prior to entering into the agreements to sell with owner-operators. For bookkeeping purposes, when an agreement to sell was entered into by SMT, the sale price of the tractor (including the total finance charge) was debited to an account called accounts receivable equipment. The equipment account on the books was credited with a portion of this amount, presumably equal to the equipment cost. The difference was treated as deferred income. As the owner-operator made payments on the purchase price of his tractor, those payments were taken into income. In this fashion, the owner-operators were treated as having made payments on both principal and income. In the statutory notice, the gain on sale of the Peterbilt tractors and the three Freightliner tractors which were subject to agreements *120 to sell entered into in fiscal 1979 was aggregated and treated as unreported income. The accrued interest was treated as interest income and the accrued interest payable on the purchase contracts was treated as deductible interest. [13]
Issue 5
The trailers which were used by SMT for the hauling of mail were loaded with mail by Postal Service employees, then sealed by them, and were not opened until delivered to another Postal Service office. Neither Mr. Davis, SMT, nor any owner-operator had any control over the loading of the trailers or over the weight of or arrangement of the contents of the trailers as loaded by Postal Service employees. On some occasions during the operation of the business, the trailers were weighed by state highway officials, found to be overweight, and fines imposed. These fines were paid by SMT, deducted by it for income tax purposes, and to the extent that the Postal Service reimbursed SMT for overweight fines, the *121 reimbursements were included in SMT's income. For SMT's 1978 fiscal year respondent disallowed a deduction of miscellaneous expense in the amount of $459.50, and for the 1979 fiscal year a deduction for traffic violations in the amount of $7,889.07. Petitioners contend that both of these sums represent overweight fines. On this record, we cannot determine whether or not either of these amounts actually represented fines for overweight violations or for other types of traffic offenses or some other disbursement. Similarly, the amounts of Postal Service reimbursements to SMT for any portion of either of these amounts cannot be ascertained from this record, except that the Postal Service in August 1978 authorized reimbursement to SMT for several fines amounting to $62 each and one in a larger amount, in all totaling in the sum of $402 for overweight fines. This reimbursement was for fines paid to Coffee County, Tennessee. One of SMT's mail routes passed through this county and $62 appears to have been a typical overweight fine. Issue 6
SMT's board of directors, at a meeting held on July 2, 1979, approved bonuses for the 1979 fiscal year, to be paid on or before September 15, 1979, *122 to its officers and employees in the following amounts: Tony Davis -- $25,000 Shirley M. Davis -- $10,000 Deborah L. Price -- $5,000 Jack W. Fisher -- $5,000 Jack W. Davis -- $7,500 Ray H. Fisher -- $4,960 The minutes of this board of director's meeting recite that the corporation was "very sound financially with a good profit for this year." Payroll checks for said bonuses were prepared on September 15, 1979. The checks for Deborah L. Price, sister of Mr. Davis, and Jack W. Davis were signed, delivered, and thus paid to those two individuals. The checks to Mr. Davis, to his mother Shirley M. Davis, and to Ray H. Fisher were prepared but apparently were never signed or negotiated. However, SMT included in its payroll deduction for its 1979 fiscal year all of the five bonus amounts. The bonus amounts were included in the W-2's issued to each of these five individuals. Mr. Davis, Mrs. Shirley M. Davis, and Mr. Fisher all included the bonuses in their 1979 Federal income tax returns. Thereafter, SMT prepared and delivered amended W-2's which deleted the unpaid bonus amounts and amended its 1979 income tax return in May 1982 to reduce its wage and salary deduction. Each of these *123 individuals filed amended income tax returns reducing compensation income by the amounts of the several bonuses. In the case of Mr. Davis, an amended 1979 income tax return was filed by petitioners Davis with the Internal Revenue Service on April 19, 1982, reducing income by the amount of the $25,000 bonus. The explanation included with the return was as follows: Taxpayer was entered on books for a $25,000.00 bonus which was shown on the original W-2 form. He, however, never was paid said bonus by Southeastern Mail Transport, Inc. (59-1775331) and the corporation is now out of business. When the bonus checks were issued in September 1979, SMT apparently had sufficient cash in its bank account to have paid all five of the checks if they had been signed, delivered, and negotiated. On September 14, 1979, SMT's bank balance in the Southeast First Bank of Jacksonville, Florida, was over $122,000. On September 17, 1979, the balance was over $215,000. However, the balance gradually decreased to approximately $42,000 by the end of September. The month of October 1979 reflects a similar pattern with the balance increasing to over $350,000 at the beginning and reducing to approximately *124 $45,000. SMT experienced cash flow problems during its 1980 fiscal year. For that reason, Mr. Davis did not sign and deliver the checks to his mother, to Mr. Fisher, and to himself. He expected that SMT could conveniently pay these sums at some future time. OPINION Issue 1
Whether Mr. Davis purchased the twelve tractors on his own behalf or as an agent for SMT is a purely factual question. Every significant fact points to the conclusion that Mr. Davis in his individual capacity purchased these twelve tractors and resold them to twelve owner-operators. In ten of the twelve purchase agreements, the buyer (in some cases described as "debtor") is shown as Tony E. Davis. In those instances where the copies of the documents show the signatures, the name "Tony E. Davis" is written manually, presumably by Mr. Davis. On the General Electric Credit Corporation contract which shows the purchaser as Tony Davis DBA Southeastern Mail Transport, Inc. the manual signature is illegible. However, the letters "DBA" refer to the phrase "doing business as" which again reflects Mr. Davis as an individual using a trade name. The twelfth retail installment contract dated December 5, 1977, does show *125 the purchaser as "Southeastern Mail Transport, Inc." The signature line has the typed name of SMT with the word president below, obviously intended for signature by Mr. Davis in his capacity as president, with Mr. Davis himself listed individually as a "cosigner." This copy does not show any manual signatures. It is only with respect to this twelfth tractor that any responsible argument can be made that SMT was intended to be the purchaser. With respect to the eleven tractors purchased in Mr. Davis' name, petitioners' arguments border on being frivolous. We recognize that, as Mr. Davis himself testified, it is probable that some payments from the agreements to sell may have been taken into income by SMT, thus to some extent duplicating the short-term capital gain reported in 1977 by petitioners Davis. The extent of this double reporting, if it in fact occurred, cannot be determined on the basis of this record. What is important is that petitioners Davis consistently treated these twelve tractors as having been purchased by them and resold by them to owner-operators, at least until, as Mr. Davis testified, in looking over the SMT books, he came to the conclusion that there had been *126 some double reporting of gain from the resale. However, apparently Mr. Davis did not during the audit of the 1977 income tax return contend that he had purchased these tractors as agent for SMT. His amended Federal income tax return filed in 1981 does not take that position; rather the grounds for the refund are that ownership (presumably for tax purposes) had remained in Mr. Davis. The original petition filed by petitioners Davis recites that this property was "purchased and owned by the petitioners," and that they were "the legal owner" of the tractors. Petitioners Davis were at that time contending that the agreements to sell were not effective to transfer the benefits and burdens of ownership to the owner-operators. It is not until the amended petition was filed in 1984 that the agency contention appears in the record. It is apparent that this agency theory was crafted at the last minute by petitioners to switch the burden of the short-term capital gain from petitioners Davis to petitioner SMT which is now apparently insolvent. A taxpayer is permitted to arrange his affairs so as to minimize his Federal tax liability but facts cannot be changed after they take place on the *127 basis of hindsight for this or any other purpose. In both form and substance these twelve tractors were purchased by Mr. Davis in his individual capacity. The agreements to sell were also entered into by him in his individual capacity. Petitioners cannot now be heard to challenge those facts. We emphasized in Illinois Power Co. v. Commissioner, 87 T.C.     (Dec. 23, 1986), the importance attached to the consistency between tax reporting and the substance of a transaction. Here, the tax reporting and the substance of the transaction is also consistent. See Coleman v. Commissioner,87 T.C. 178, 200-202 (1986). We hold for respondent. As we have noted, petitioners have not here argued that if we hold that Mr. Davis purchased the tractors, then the agreements to sell did not transfer the benefits and burdens of ownership to the owner-operators. The parties have stipulated that "if the Davis' are not allowed to capitalize interest on the tractors referred to in paragraph 133 [the twelve tractors], respondent's computations in the notice of deficiency regarding short-term capital gain, interest income, and interest expense are correct." This stipulation is at the very least ambiguous *128 in light of the position of petitioners on whether these twelve tractors were purchased by Mr. Davis individually or as agent for SMT. In any event we conclude that petitioners have stipulated that the recomputation of the short-term capital gain in the deficiency notice is correct. Since we hold in our discussion of Issue 2 below that the agreements to sell transfer ownership for tax purposes to the owner-operators, short-term gain as determined by respondent is taxable to petitioners Davis, and petitioners Davis are not entitled to investment tax credit on these tractors. See Issue 2 below. Issue 2
The question to be resolved here is whether the benefits and burdens of ownership of the tractors passed to the owner-operators upon entering into the agreements to sell or were retained by SMT or Mr. Davis, except as to the three Freightliners as to which agreements to sell were entered into in SMT's fiscal 1980 year. Section 1.46-3(a)(2), Income Tax Regs., provides as follows: The basis (or cost) of section 38 property placed in service during a taxable year shall not be taken into account in determining qualified investment for such year if such property is disposed of or otherwise *129 ceases to be section 38 property during such year, except where sec. 1.47-3 applies. Thus, if individual A places in service during a taxable year section 38 property and later in the same year sells such property, the basis (or cost) of such property shall not be taken into account in determining A's qualified investment. * * * In order to determine whether section 38 property is disposed of or otherwise ceases to be section 38 property see sec. 1.47-2. [14]
Pursuant to this regulation, if we hold, as we do, that the agreements to sell transferred the benefits and burdens of ownership for tax purposes to the owner-operators, then petitioners are not entitled to claim investment tax credits in those instances where the agreements to sell were entered into in the same year as the acquisition of the tractors. That is the fact with respect to the twelve tractors purchased by Mr. Davis, the eight Peterbilt tractors, and three of the Freightliner tractors. The remaining three Freightliner tractors were purchased by SMT in its 1979 fiscal year but were not made subject to agreements to sell until its 1980 *130 fiscal year. Thus this regulation has no bearing on entitlement to investment tax credit. However, respondent's argument is that these three tractors were not placed in service by SMT but were held for sale in the ordinary course of its business. If that is correct, then the tractors were not depreciable property during fiscal 1979 and hence would not be section 38 property. Section 48(a)(1) provides: (1) * * * the term "section 38 property" means -- (A) tangible personal property * * * * * * Such term includes only property with respect to which depreciation * * * is allowable * * *. [15]
Entitlement of SMT to the credit with respect to these three Freightliner tractors must be discussed separately from the balance of the tractors. Petitioners' arguments in support of its claim to the credit seem to boil down to the contention that it was the intention of the parties for SMT to retain the investment credit, based on the verbiage of the agreements to sell, that the owner-operators were financially irresponsible and built up little equity in the tractors and the owner-operators had little or no risk capital invested. Respondent in very general *131 language argues that the benefits and burdens of ownership passed to the owner-operators. Neither party has favored us with helpful case law or with any analysis of the agreements to sell. We have held: For purposes of Federal income taxation, a sale occurs upon transferring sufficient incidents of beneficial ownership rather than technical requirements for the passage of title under State law. * * * Beneficial ownership is marked by command over property or enjoyment of its economic benefits. * * * The retention by a seller of formal attributes of ownership does not preclude finding a sale. * * * [Citations omitted. Yelencsics v. Commissioner,74 T.C. 1513, 1527 (1980).] "The question of when a sale is complete for Federal tax purposes is essentially one of fact. The applicable test is a practical one which considers all the facts and circumstances, with no single factor controlling the outcome." Derr v. Commissioner,77 T.C. 708, 724 (1981). See also Durkin v. Commissioner, 87 T.C.     (Dec. 22, 1986); Grodt & McKay Reality, Inc. v. Commissioner,77 T.C. 1221, 1227 (1981). There is little if any evidence before us as to what the parties intended other than that which we can *132 glean from the language of the various documents involved and the parties' actions pursuant thereto. For a sale to occur, there must be a binding agreement between seller and buyer as to all the material terms of the transaction and that agreement must effect a present transfer of the benefits and burdens of ownership. Hammerstrom v. Commissioner,60 T.C. 167, 183 (1973). We have no evidence before us as to how the owner-operators treated their tractors for tax purposes. Giving petitioners the benefit of the doubt on this point, we will assume that both parties intended that SMT (and Mr. Davis) retained the investment tax credits, and that both parties were consistent in their tax reporting. That, however, is of no significance. Unlike the privilege given by Congress to the parties to a lease, the parties to a sale cannot agree among themselves as to which party (the seller or the buyer) is entitled to claim the credit. Although the parties have stipulated that some of the tractors were placed in service in the year of sale there is no evidence as to the actual dates on which any of the tractors were placed in service or whether they were placed in service prior to or after the *133 making of the agreements to sell. Petitioners do not, however, contend that any of these tractors were placed in service by any of petitioners prior to entering into the agreements to sell. [16] The fact that the owner-operators may have been financially unable to maintain their tractors and in many instances did not do so is simply irrelevant to this issue. These agreements to sell were binding agreements which transferred to each owner-operator all of the benefits and burdens of ownership except for mere legal title which SMT or Mr. Davis was obligated to transfer upon full payment of the purchase price. The fact that none of petitioners claimed depreciation on any of these tractors is not without significance in this context. These agreements do not constitute agreements to effect a sale at some point in the future. [17] We conclude that for Federal tax purposes the owner-operators became the owners of each tractor upon execution of the agreement to sell. Therefore neither Mr. Davis nor SMT was entitled to claim investment tax credit on any of the twelve tractors purchased and resold by Mr. Davis, or on the eight Peterbilt tractors or the three Freightliner tractors purchased and *134 resold by SMT during its 1979 fiscal year. At least with respect to the twelve tractors, the argument that the benefits and burdens of ownership did not pass was an afterthought. There is no evidence in this record as to when the remaining three Freightliner tractors were placed in service, but petitioners do not contend that it happened in fiscal 1979. The fact that these tractors were sold during the first month of SMT's 1980 fiscal year permits the inference that they were purchased for that purpose. Petitioners have the burden of proof on this issue and in the absence of any proof that respondent's determination is incorrect we hold for respondent with respect to these three tractors. Thus on the issue of entitlement to investment tax credit, we hold for respondent. Issue 3
The parties have essentially stipulated to the correctness of respondent's calculations which exclude interest from the basis of assets for depreciation and investment tax credit *135 purposes, allow interest deductions and include interest in income. To the extent the stipulations may not fully cover all of these adjustments, petitioners have not argued that there is any error in the calculations and are deemed to have conceded that they are correct. It is also stipulated that SMT did not make an election for the appropriate years under section 266 as to certain of the property. Neither do petitioners contend that any such election was made by any petitioner as to any property. Such election is essential. See section 1.266-1(c), Income Tax Regs.[18]
Petitioners' argument on this matter appears to be simply that their use of the time price in calculating basis was consistent, that some other unnamed taxpayers have treated interest on deferred payment contracts in this same fashion, and that respondent's adjustments are incorrect. Petitioners do not, however, make the argument that their treatment of interest constituted a permissible *136 method of accounting under section 446 which has been changed by respondent. There is simply no provision in the Internal Revenue Code which permits the capitalization of interest expense other than section 266 or the capitalization of interest income. Petitioners do not argue that the finance charges were anything other than interest. No statute or case law has been cited in support of petitioners' position and we know of none. The fact that SMT was an accrual-basis taxpayer has no bearing on this matter. We hold for respondent. See, e.g., Foster v. Commissioner,80 T.C. 34, 211-214 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985). Issue 4
Petitioners do not directly dispute this adjustment. They do argue that SMT did not sell, for tax purposes, the eight Peterbilt and three Freightliner tractors during fiscal 1979. If we had sustained petitioners in this position, obviously gain on these sales would not be includable in SMT's income and we would so hold despite the failure of petitioners to address this issue directly. However, we have concluded that the tractors were sold and petitioners are deemed to have conceded the correctness of the calculation of this unreported *137 income. We hold for respondent. Issue 5
The check in payment of this $25,000 bonus to Mr. Davis remained in his possession or under his control from the time it was issued. The corporation had adequate funds on hand so that it could have been paid on the date issued. Failure to pay it was simply an exercise of discretion by Mr. Davis. Under respondent's regulations, income is constructively received when it is "credited to his account, set apart for him or otherwise made available so that he may draw upon it at any time." Sec. 1.451-2, Income Tax Regs. Mr. Davis as president had it within his power to rescind the bonus payment to himself (and to his mother and Mr. Fisher) but no such action was taken until long after the close of the 1979 calendar year. Both SMT and the individuals in their 1979 tax and fiscal 1979 returns treated the bonuses as paid. Mr. Davis' testimony is in effect that he chose to leave his own bonus in the corporate till until he felt it would be appropriate to transfer the cash to himself. Petitioners have the burden of proof. They have failed to convince us that SMT either legally or practically could not honor Mr. Davis' bonus check when issued. The *138 test of constructive receipt is met. See, e.g., F.D. Bissett & Son, Inc. v. Commissioner,56 T.C. 453 (1971); Haack v. Commissioner,T.C. Memo. 1981-13. Issue 6
Petitioners argue with merit that SMT had no responsibility for overweight fines for which SMT was reimbursed by the Postal Service. However, liability was incurred for traffic fines other than for overweight either by SMT or the drivers and petitioners have not demonstrated that the disputed amounts are solely related to overweight fines, reimbursement for which was taken into income. There is no evidence whatever as to the nature or composition of the fiscal 1978 expense in the amount of $459.50 or the fiscal 1979 traffic violation deduction of $7,889.07. To the extent that these sums reflect payments for traffic violations for which SMT may have been responsible, the amounts would not be deductible. Sec. 162(f). In all likelihood, some owner-operators incurred traffic violation liabilities which were initially paid by SMT subject to reimbursement out of funds due to the owner-operators and other traffic violations may have been incurred by drivers employed by SMT. If SMT advanced funds against driver or owner-operator *139 reimbursement and it was unable to obtain reimbursement, such loss might be deductible but SMT has not argued for this treatment and the record is insufficient to support a deduction on this theory. Petitioners have the burden of proof and unfortunately for petitioners there is simply no way in which we can segregate from these two sums the amounts for which it was reimbursed by the Postal Service as overweight violations with one minor exception. Petitioners introduced in evidence a copy of a Postal Service order dated August 23, 1978, directing reimbursement in the amount of $402 in payment of overweight fines paid to Coffee County, Tennessee. Petitioners have satisfied us that one of the mail routes went through this county and that $62 was a possible overweight fine in that county. We will allow SMT a deduction in the amount of $402 for its 1979 fiscal year. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). To reflect the foregoing, In docket No. 732-81 decision will be entered for respondent; in docket No. 703-81, decision will be entered under Rule 155.
Footnotes
1. Petitioners Davis claimed investment tax credit on their 1977 tax return for these twelve tractors, which was disallowed by the statutory notice. By an amendment to their petition filed October 17, 1984, petitioners Davis now claim that these tractors were purchased by Mr. Davis as agent for SMT. The purpose for this change in position appears to be the elimination from the 1977 tax liability of petitioners Davis of short-term capital gain on resale of the tractors of $75,440.25. Petitioners Davis do not make an alternative claim to the credit if we conclude that Mr. Davis, not SMT, was the purchaser. However, this is immaterial by reason of our resolution of the credit issue. ↩
2. On brief petitioners object to certain of respondent's proposed findings of fact relating to this adjustment but do not otherwise argue against it as a separate issue. However, in support of their claim to investment tax credit, petitioners do argue that none of the tractors were sold. Therefore, we deem that petitioners concede that respondent's calculation of omitted income on sale of these tractors is correct if we determine, as we do, that sales of these eleven tractors were completed for tax purposes in SMT's 1979 fiscal year.↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
4. Throughout this opinion we use the word "trailer" to describe that vehicle in which the mail was loaded, which was not self-propelled, referred to in the stipulation as a "van trailer" or "van semi-trailer." The word "tractor" refers to the self-propelled unit. If there were any conventional trucks (self-propelled vehicle with a storage compartment in the rear portion), we assume that these were treated by the parties in the same fashion as trailers. The term "owner-operator" refers to those individuals trained to act as drivers of these large vehicles who entered into the "agreements to sell" and were treated by Mr. Davis and SMT as independent contractors.↩
5. The Postal Service apparently considered that the hauling of mail by a tractor owned and operated by a person who was an independent contractor constituted a subcontract. It is unclear whether the regulations permitted 40 percent or 60 percent of the tractors in use to be owned by third parties. A finding as to the exact percentage is immaterial. Hence, for convenience we use the 50-percent figure. Some of the tractors owned by or leased to SMT may have been leased to drivers as independent contractors, while the remainder were apparently driven by employee-operators hired by SMT for that purpose.↩
6. The purchase agreement on one of the tractors shows the purchaser as SMT with Mr. Davis as a co-signer of the retail installment contract and one describes the purchaser as "Tony Davis DBA Southeastern Mail Transporting, Inc." The parties have stipulated to the facts set out in the text and the twelve tractors have been treated by the parties as a unit. Therefore, we ignore the discrepancies in the verbiage of the purchase agreements. ↩
7. We assume that the omitted portions of each of these twelve contracts are immaterial to our decision in the case. 8. All but two of the purchase agreements are dated subsequent to July 1, 1977, the date as of which SMT is treated as having begun business. The other two undated contracts are subject to agreements to sell which are dated in November 1977. The initial installments of purchase price on these two undated purchase contracts are respectively in November and December 1977. Therefore, we infer that these purchases were effected in November 1977.↩
9. These agreements to sell will be discussed in more detail under Issue 2.↩
10. Five of the Peterbilt tractors were actually purchased in the name of SMT. The other three were purchased in the names of Tony E. Davis and Jones E. Davis DBA Southeastern Mail Transport, Inc. All of the agreements to sell the Peterbilt tractors show the seller as Tony E. Davis. However, both parties have treated all Peterbilt tractors as purchased by SMT and as though SMT entered into the agreements to sell. Since this discrepancy is not material to our opinion, for purposes of this case, we accept that treatment. We note that the Freightliner tractors were purchased in the name of SMT and the agreements to sell were entered into in the name of SMT.
11. In several instances the copies of the agreements to sell are incomplete in that an exhibit which includes uniform commercial code covenants is omitted. Several of the agreements to sell consist of only the first page and in one only the first two pages. Neither party has suggested, however, that any of the preprinted parts of the two separate forms differ from those examples of the particular forms which appear to be complete. There is one aberration in the agreements to sell. Although we cannot be certain since we do not have the originals, it appears that one of the agreements pertaining to the twelve tractors acquired by Mr. Davis uses the preprinted Tony Davis form but the introductory clause appears to be unique. Instead of being a part of the preprinted material, this paragraph appears to have been typed. The seller is described as SMT "as assignee of Tony E. Davis." Petitioners have not argued that the purchase and agreement to sell this tractor should be treated any differently from any of the other group of twelve purchased in 1977.
12. Neither party has explained the significance to any of the issues before the Court of the omission from the SMT form of agreement to sell of a reference to a hauling contract (and presumably the omission to enter into a written hauling contract with the owner-operator). We assume there is none.
13. We have not undertaken to verify these calculations. Many of the documents are incomplete and substantially illegible and, as noted, to the extent that the calculations have not been stipulated, their correctness is deemed to be conceded.↩
14. The provisions of sec. 1.47-2, Income Tax Regs.↩, are not helpful in this context.
15. See sec. 1.48-1(a), Income Tax Regs.↩
16. Such an argument would not have assisted petitioners except with respect to the three Freightline tractors where the agreements to sell were entered into in the succeeding fiscal year. ↩
17. See, e.g., Rev. Rul. 69-93, 1967-1 C.B. 139↩.
18. No issue is made in this case as to whether or not the interest on these tractors and trailers would be within the scope of sec. 266 if the election had been made and no inference as to that matter should be drawn from this opinion.↩