112 T.C. No. 20


UNITED STATES TAX COURT


ALDRICH H. AMES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14031-96.                    Filed May 28, 1999.


        In 1985, P, an employee of the Central
Intelligence Agency, began selling classified
information to the Soviet Union.  During 1985, P
received a communication from a Soviet agent that $2
million had been set aside for P to draw upon.  On
Apr. 28, 1994, P pled guilty to conspiracy to commit
espionage and tax conspiracy to defraud the U.S.
Government.  P was sentenced to life imprisonment on
the espionage charge and to 27 months' imprisonment on
the tax charge.
        R determined that P failed to report as income
amounts received and deposited in his bank accounts
during 1989 through 1992.  P contends that he
constructively received the majority of the illicit
espionage income in 1985, the year he was informed that
$2 million had been set aside for him.  P also contends
that he is protected by the Double Jeopardy Clause of
the Fifth Amendment to the U.S. Constitution from the
assessment of any tax or civil penalties based upon his
illegal espionage income.

P sought to discover R's criminal reference letter. Generally, criminal reference letters contain detailed recommendations by R's attorneys that a taxpayer be prosecuted for criminal tax violations. R refused to turn over the letter, claiming the work product privilege applied. P contends that the privilege does not apply to this civil proceeding. If we decide it does apply, P argues that we should apply a balancing test and decide that his substantial need overcomes the need for assertion of the privilege.

Held: The work product privilege applies to the criminal reference letter, and P has not shown substantial need that would vitiate R's claim of work product privilege. Held, further, P did not constructively receive income before specific amounts were made available to him. Held, further, the imposition of a tax liability on P's espionage income and/or the imposition of an accuracy-related penalty does not constitute punishment within the meaning of the Double Jeopardy Clause.


Aldrich H. Ames, pro se.

Richard F. Stein and John C. McDougal, for respondent.


GERBER, Judge: Respondent determined deficiencies in petitioner's Federal income tax and section 6662(a)[1] penalties as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|------------|----------------------|
| 1989 | $214,303.51 | $42,860.70 |
| 1990 | 19,970.77 | 3,994.15 |
| 1991 | 27,367.39 | 5,473.48 |
| 1992 | 58,684.57 | 11,736.91 |

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years under consideration, and all Rule references are to this Court's Rules of Practice and Procedure.

The issues for our consideration are: (1) Whether petitioner constructively received income from illegal espionage activities during 1985, when it was allegedly promised and/or set aside for him, or when it was received and/or deposited in his bank accounts during the taxable years 1989, 1990, 1991, and 1992 in the amounts of $745,000, $65,000, $91,000,[2] and $187,000, respectively; (2) whether petitioner is liable for the accuracy-related penalty for taxable years 1989 through 1992; (3) whether petitioner is constitutionally protected by the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution from the assessment and/or collection of any tax or civil penalties arising from espionage activity for which he was convicted and incarcerated; (4) whether the work product doctrine may be interposed by respondent in this case to prevent the turnover of respondent's counsel's criminal reference letter; and (5) if the work product privilege applies, whether petitioner has shown substantial need so as to vitiate respondent's assertion of the privilege.

---

[2] Although there was a discrepancy in the notice of deficiency over the amount of income that petitioner allegedly failed to report in 1991, respondent used $91,000 for purposes of calculating the amount of the deficiency. Therefore, we will use that number for purposes of this opinion.

FINDINGS OF FACT[3]

Petitioner is incarcerated in a Federal penitentiary for turning over state secrets to a foreign government at a time when he held a position with the Central Intelligence Agency (CIA) of the United States.  He had his legal residence in Allenwood, Pennsylvania, at the time the petition in this case was filed. Petitioner's employment with the CIA spanned the years 1962 to 1994, during which he was assigned to progressively more responsible positions involving the Union of Soviet Socialist Republics (Soviet Union) and Soviet Bloc Eastern European countries.  Throughout that time, petitioner held a Top Secret security clearance, and he had access to information and documents classified Secret and Top Secret.

Petitioner timely filed joint Federal income tax returns with his wife, Rosario C. Ames, for the taxable years 1989, 1990, 1991, and 1992.  Petitioner's returns were filed on the cash basis for reporting income and deductions.  The returns primarily reflected income from petitioner's CIA employment in the amounts of $70,337, $60,340, $62,514, and $67,578 for 1989, 1990, 1991, and 1992, respectively.

In 1984, as part of his duties as a CIA Operations officer, petitioner began meeting with officials of the Soviet Union's

---

[3] The stipulation of facts and the attached exhibits are incorporated by this reference.

Embassy in Washington, D.C. These meetings were authorized by the CIA and the Federal Bureau of Investigation (FBI) and were designed to allow petitioner access to Soviet officials as possible sources for intelligence information and recruitment.

Sometime during April 1985, petitioner entered into a relationship with Soviet officials under which he betrayed his country and sold classified CIA information and information sourced in other branches of the U.S. Government to the KGB (the Soviet intelligence directorate) in return for large amounts of remuneration. Petitioner provided the KGB with classified Top Secret information relating to the penetration of the Soviet military and intelligence services by the CIA, including the identities of Soviet military and intelligence officers who were cooperating with the CIA and foreign intelligence services of governments friendly to the United States. Because of petitioner's disclosures, a number of these individuals were arrested and executed by the KGB.

In the fall of 1985, petitioner received a communication from a Soviet agent that $2 million had been set aside for him in an account that he would be able to draw upon. Petitioner was told that the money was being held by the Soviet Union, rather than in an independent or third-party bank or institution, on petitioner's behalf. Petitioner received $50,000 in cash for his initial disclosure to the KGB and additional cash payments, the

specific dates of which have not been detailed in the record of this case.

Petitioner met with Soviet officials in Washington, D.C., and in 1989 he met with them in Rome. In the spring of 1989, as petitioner was preparing to return to CIA headquarters in Langley, Virginia, the KGB provided him with two written documents. The first was a financial accounting that indicated that as of May 1, 1989, approximately $1.8 million had been set aside for petitioner and that some $900,000 more had been designated for him. The second document was a nine-page letter containing a list of the types of classified U.S. Government information sought by the KGB. The second document also contained a discussion of arrangements for cash dropoff payments to petitioner upon his return to the United States, a warning to petitioner to avoid traps set by the CIA, and a detailed plan governing future communications between petitioner and the KGB.

After his return to Washington, D.C., in 1989, petitioner communicated with the Soviets primarily through a complex arrangement of signal sites (a prearranged location where an individual leaves an impersonal mark or item to convey a prearranged message) and dead drops (locations for secretly leaving packages for anonymous pickup). Petitioner personally met with the Soviets only about once a year. Throughout this period, it was typical for petitioner to make a delivery of

information and receive cash by means of signal sites and dead drops. Petitioner continued his unlawful espionage activities until his arrest in 1994.

During the years 1989, 1990, 1991, and 1992, petitioner and his wife made deposits of cash received in connection with petitioner's unlawful espionage activities in the amounts of $745,000, $65,000, $91,000, and $187,000, respectively. These deposits did not represent transfers of funds from other accounts or redeposits of currency previously withdrawn from other accounts. Petitioner did not report on his income tax returns for taxable years 1989, 1990, 1991, and 1992 any of the amounts received from the KGB in connection with his illegal espionage activities. Petitioner did not report on a Federal income tax return (including his 1985 return) any amount of unlawful income he received or that had been set aside for him.

On April 26, 1994, petitioner was indicted in the U.S. District Court for the Eastern District of Virginia on charges of conspiracy to commit espionage, under 18 U.S.C. sec. 794(c), and conspiracy to defraud the U.S. Internal Revenue Service, under 18 U.S.C. sec. 371. On April 28, 1994, petitioner pled guilty to both counts of the indictment. The indictment contained a criminal forfeiture count pursuant to 18 U.S.C. sec. 794(d). Petitioner was sentenced to life imprisonment on the espionage charge and to 27 months' imprisonment on the tax charge, the two

sentences to run concurrently.  In addition, the plea agreement provided for the criminal forfeiture of whatever interest petitioner had in espionage-related assets.  At the time of trial, petitioner was serving a life sentence in a Federal penitentiary.

OPINION

## I.  Work Product Doctrine--Criminal Reference Letter

We first consider petitioner's motion to compel production of respondent's criminal reference letter (CRL).  CRL's typically contain a detailed recommendation and supporting legal analysis, from the Commissioner to the U.S. Department of Justice, that a taxpayer be prosecuted for various criminal tax violations.  See Brown v. Commissioner, T.C. Memo. 1994-282.

Tax Court Rules provide for discovery of information that is not privileged but is relevant to the subject matter involved in the pending case.  See Rule 70(b).  A party opposing discovery bears the burden of establishing that the information sought is privileged.  See Zaentz v. Commissioner, 73 T.C. 469, 475 (1979).

Respondent contends that the CRL was prepared in anticipation of litigation and, thus, is protected under the work product doctrine.  We agree.  The CRL contains respondent's counsel's legal analysis that petitioner be criminally prosecuted for various tax violations.  This type of correspondence is a classic example of attorney work product.  See, e.g., Brown v.

<u>Commissioner</u>, <u>supra</u>.  Petitioner does not question the categorization of the CRL as attorney work product in the context of the criminal case.  He argues that the CRL was prepared for the criminal case, and therefore respondent should not be allowed to assert the work product privilege in this subsequent civil proceeding.  Petitioner also argues that he has shown substantial need for the CRL that would be sufficient to overcome respondent's assertion of the work product privilege.  We address each of petitioner's arguments separately.

A.  <u>Does the Privilege Extend to Subsequent Litigation?</u>

Generally, the protective cloak of the work product doctrine covers material prepared by an attorney in anticipation of litigation.  See <u>Hartz Mountain Indus., Inc. v. Commissioner</u>, 93 T.C. 521 (1989).  Petitioner argues that the privilege should extend only to the anticipated litigation for which the document was prepared and not to subsequent litigation.  In determining whether the privilege extends to concurrent or successive proceedings, some courts consider the degree and type of relationship between the first and second proceeding.[4]  See <u>In re</u>

---

[4] Some Courts of Appeals have extended the privilege to unrelated litigation.  See, e.g., <u>Duplan Corp. v. Moulinage et Retorderie de Chavanoz</u>, 487 F.2d 480 (4th Cir. 1973); see also <u>FTC v. Grolier</u>, 462 U.S. 19, 25-27 (1983) (and cases cited therein).

Grand Jury Proceedings, 604 F.2d 798, 803 (3d Cir. 1979); Puerto Rico v. SS Zoe Colocotroni, 61 F.R.D. 653, 658 (D.P.R. 1974).

The work product doctrine is intended to enable a lawyer to "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Hickman v. Taylor, 329 U.S. 495, 510 (1947). A civil tax case could be anticipated to follow a criminal tax case. The rationale behind the work product doctrine would be frustrated if documents prepared for the first action were open to an opposing party in the second action that was anticipated and concerned a related matter. Documents prepared for a civil proceeding before the Environmental Protection Agency qualified for the work product privilege in a subsequent criminal matter. See In re Grand Jury Proceedings, supra.

Respondent's CRL was prepared in connection with petitioner's criminal tax investigation. There is subject matter identity between petitioner's criminal tax violations and petitioner's civil tax liability and the present civil tax action. There is a foreseeable and reasonable expectation that the Government will pursue a civil tax liability that may be derivative of criminal tax violations. We do not hesitate in finding a nexus between respondent's CRL and this civil proceeding. Accordingly, the work product privilege should extend to this civil proceeding even though the letter was

prepared specifically to address petitioner's criminal tax investigation and prosecution.

B.  Has Petitioner Shown Substantial Need Sufficient To Vitiate the Asserted Privilege?

Petitioner contends that even if we find a nexus for the application of the work product doctrine to this civil proceeding, he has made a sufficient showing of substantial need outweighing the need for the protection provided by the work product doctrine.  The work product privilege is a qualified one that, in some circumstances, may be overcome by a showing of good cause and substantial need.  See In re Grand Jury Investigation, 599 F.2d 1224, 1231 (3d Cir. 1979); Puerto Rico v. SS Zoe Colocotroni, supra at 658.  We note, however, that the CRL falls squarely within the work product category because it contains an attorney's mental impressions and conclusions.  See In re Grand Jury Investigation, supra at 1231.

Petitioner contends that the CRL would enable him to show that respondent's motive in pursuing the civil tax liabilities is punitive and that, therefore, this proceeding would be barred by the Double Jeopardy Clause of the Fifth Amendment.  Petitioner's argument is flawed.  The Double Jeopardy Clause protects against the imposition of multiple criminal punishments for the same offense.  See Hudson v. United States, 522 U.S. 93 (1997). Respondent's motive behind pursuing this civil tax case is not

relevant in determining whether this Court's imposition of civil tax penalties against petitioner violates the Double Jeopardy Clause.[5] Under these circumstances, petitioner has not demonstrated substantial need for the protected document, and we hold that petitioner is not entitled to compel production of the CRL from respondent.

## II. When Should Petitioner Have Reported the Income From His Illegal Espionage Activities?

Petitioner contends that he constructively received most[6] of the unlawful espionage income in 1985, and, accordingly, he was not required to report the income received and deposited during the taxable years 1989, 1990, 1991, and 1992. Respondent contends that the income was reportable in 1989 through 1992, the years petitioner actually received and deposited cash in his bank accounts. Petitioner concedes that the funds deposited during

---

[5] A detailed discussion of the Double Jeopardy Clause and whether it applies in the setting of this case may be found infra.

[6] Petitioner contends that he constructively received almost $2 million in 1985 and, in addition, that he received $10,000 per month or $120,000 per year during each of the years at issue. Other than his constructive receipt contention, petitioner does not contend that we should modify respondent's determination. Respondent determined, on the basis of petitioner's bank deposits, that he underreported his income by $745,000, $65,000, $91,000, and $187,000 for the taxable years 1989, 1990, 1991, and 1992, respectively. Petitioner, however, does not argue that we should increase respondent's determinations for the 1990 and 1991 years, which are less than the amounts petitioner has contended that he received. Likewise, respondent did not assert an increased deficiency for the 1990 or 1991 tax years.

the years in issue represent cash received from the Soviet Union during the years of the deposits. Petitioner argues, however, that most of the amounts he received during the taxable years under consideration were constructively received in 1985.[7]

A taxpayer reporting income on the cash method of accounting, such as petitioner, must include an item in income for the taxable year in which the item is actually or constructively received. See sec. 451(a). The concept of constructive receipt is well established in tax law. The courts have regularly looked to section 1.451-2(a), Income Tax Regs., for the following definition of the term "constructive receipt":

> (a) General rule. Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.
> * * *

---

[7] At trial, petitioner testified that he constructively received but fraudulently failed to report the illicit income for 1985. He explained that if he had reported the income on his Federal income tax return, his illicit and secret relationship with the Soviet Union would have been revealed. We note that petitioner's concession may have placed him at a disadvantage irrespective of our holding here. For example, if petitioner fraudulently failed to report income for 1985, the period for assessment would not have expired for 1985. See sec. 6501(c)(1).

Following the regulatory definition, courts have held that income is recognized when a taxpayer has an unqualified, vested right to receive immediate payment. See Martin v. Commissioner, 96 T.C. 814, 823 (1991); Ross v. Commissioner, 169 F.2d 483, 490 (1st Cir. 1948), revg. and remanding on another issue a Memorandum Opinion of this Court. Normally, the constructive receipt doctrine precludes the taxpayer from deliberately turning his back on income otherwise available. See Martin v. Commissioner, supra; Young Door Co. v. Commissioner, 40 T.C. 890, 894 (1963). Here, however, petitioner relies on constructive receipt as a foil to respondent's determination that the unlawful income was reportable during the years before the Court. In any event, the essence of constructive receipt is the unfettered control over the date of actual receipt. See Hornung v. Commissioner, 47 T.C. 428, 434 (1967).

The determination of whether a taxpayer has constructively received income is to be made largely on a factual basis. See Hughes v. Commissioner, 42 T.C. 1005, 1012 (1964). Resolution of the controversy in petitioner's favor depends on whether he can show that he constructively received about $2 million in 1985, the year he was informed that an amount had been set aside for him. Under the circumstances here, petitioner did not possess "unfettered control" over the $2 million in 1985.

Assuming arguendo that some type of account was created and funds were segregated for petitioner, he did not have ready access to it, and certain conditions had to be met or had to occur before he could gain physical access to any funds. Petitioner had to contact the Soviets, using a complex arrangement of signal sites, to determine whether a "withdrawal" could be made. Next, the Soviets had to arrange to have the cash transferred into the United States and have it secretly left in a prearranged location for petitioner. There was no certainty that these conditions and steps could be accomplished under the existing circumstances, and the conditions represented substantial risks, limitations, and restrictions on petitioner's control of the funds, assuming they were even in existence and segregated for his exclusive benefit. See Paul v. Commissioner, T.C. Memo. 1992-582 (no constructive receipt where taxpayer would have had to travel 68 miles in order to turn in winning lottery ticket). There is no constructive receipt of income where delivery of the cash is not dependent solely upon the volition of the taxpayer. See Hornung v. Commissioner, supra at 435.

So long as the Soviets retained control over any funds or promised set-asides, there was no practical or legal way in which petitioner could compel payment. Constructive receipt of income has been found where a corporation offers payment or pays by check in one year, but the recipient refuses delivery or fails to

cash the check until the following year. See, e.g., <u>Frank v. Commissioner</u>, 22 T.C. 945 (1954), affd. per curiam 226 F.2d 600 (6th Cir. 1955); <u>Southeastern Mail Transp., Inc. v. Commissioner</u>, T.C. Memo. 1987-104. Here, no such proffer was made, and petitioner did not have a legally enforceable claim. If the KGB had questioned petitioner's loyalty at any time before payment, there is no assurance that petitioner would have continued to receive cash deliveries or payments. So long as the Soviet Union retained the ability to withhold or control the funds, there was no constructive receipt. Petitioner did not constructively receive the income before it was made physically and/or practically available to him. Accordingly, we hold that petitioner received and failed to report income in the amounts of $745,000, $65,000, $91,000, and $187,000 for the years 1989, 1990, 1991, and 1992, respectively.

III. <u>Is Petitioner Liable for the Negligence Penalty?</u>

Respondent determined that each of petitioner's underpayments was due to negligence or disregard of rules or regulations. Section 6662(a) and (b)(1) provides for an accuracy-related penalty equal to 20 percent of the portion of the underpayment that is attributable to negligence or disregard of rules or regulations. Petitioner must show that respondent's determination is erroneous. See Rule 142(a).

"Negligence" is statutorily defined as "any failure to make a reasonable attempt to comply with the provisions of [the internal revenue laws]". Sec. 6662(c). "[D]isregard" is defined as "any careless, reckless or intentional disregard" of rules or regulations. Id.

Petitioner contends that he was not required to report the income for the 1989 through 1992 tax years because it was constructively received during 1985. We note that, although petitioner contends that the income in question should have been reported for 1985, he has admitted that he fraudulently concealed his espionage income and intentionally did not report it on his 1985 return.[8] Petitioner's conduct was not driven by his attempt at compliance with the internal revenue laws; rather his entire pattern of activity reflects his goal of concealment of income.

Petitioner, in that same vein, made the novel argument that his failure to report his unlawful income was due to fraud, not negligence, and that the fraud and negligence penalties are mutually exclusive.[9] To the extent that petitioner may not be found liable for both the fraud and the negligence penalties,

---

[8] Petitioner characterized as fraudulent his failure to report the receipts that he contends were constructively received during 1985.

[9] Respondent determined the negligence penalty for each of petitioner's taxable years in the notice of deficiency. Respondent's motion to amend the answer shortly before trial to allege civil fraud was denied.

they are mutually exclusive. See sec. 6662(b). The accuracy-related penalties and the fraud penalty may, however, be asserted in the alternative. Where the fraud penalty is not in issue or where a court decides fraud is not applicable, the negligence penalty may be considered and/or found. It is rather obvious that fraudulent concealment goes far beyond and is inclusive of "negligence or disregard of rules or regulations." Here, petitioner was convicted of conspiracy to defraud the Government under 18 U.S.C. sec. 371, and he admits that he intentionally concealed his unlawful espionage income. Additionally, his constructive receipt argument falls far short of the legal standard. We hold that petitioner is liable for the section 6662(a) negligence penalty in each of the taxable years 1989, 1990, 1991, and 1992.

IV. Is Petitioner Constitutionally Protected by the Double Jeopardy Clause of the Fifth Amendment From the Assessment of Any Tax or Civil Penalties Based Upon His Unlawful Espionage Income?

Petitioner contends that imposing an income tax liability on the income he received from his espionage activities and/or imposing a negligence penalty under section 6662 violates the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb".[10] In

---

[10] Petitioner argues that the requirement that he pay the
(continued...)

petitioner's criminal case, he was incarcerated for life, and his assets/income from espionage were forfeited.

This Court recently reaffirmed that additions to tax for fraud are a civil remedy, not a criminal punishment, and therefore beyond the scope of the Double Jeopardy Clause.  See Louis v. Commissioner, T.C. Memo. 1996-257, affd. per curiam 170 F.3d 1232 (9th Cir. 1999).  The Supreme Court, after our holding and before the Court of Appeals' affirmance in Louis, considered the nature of monetary penalties imposed on bank officers already convicted of misapplying bank funds.  See Hudson v. United States, 522 U.S. 93 (1997).  A two-step analysis was used in Hudson to determine whether a penalty is civil or criminal.  See id. at 99.  The two-step Hudson approach was not employed by our Court in Louis in concluding that the addition to tax for fraud does not constitute a criminal punishment.  The two-step process requires analysis of the statutory language to determine whether Congress indicated an express or implied preference for one label or the other, and if a civil penalty is intended, then an evaluation of "'whether the statutory scheme [is] so punitive either in purpose or effect'" that it transforms the intended

---

<sup>10</sup>(...continued)
tax and penalties are being employed as punishment.  He does not argue that his forfeiture of the income and assets associated with his illegal espionage activity should obviate any tax burden.

civil sanction into a criminal penalty.  Id. at 99 (quoting

United States v. Ward, 448 U.S. 242, 248-249 (1980)).

Congress intended the penalty for negligence to be a civil,

not a criminal, sanction.  See Helvering v. Mitchell, 303 U.S.

391, 402 (1938); Louis v. Commissioner, 170 F.3d at 1235.  The

statutory language reflects that the section 6662 accuracy-

related penalty for negligence is a penalty in connection with

civil tax liability (addition to the tax).  See also Louis v.

Commissioner, 170 F.3d at 1235, where the same conclusion was

reached by the Court of Appeals concerning the civil fraud

penalty.

Having decided that a civil penalty was intended, we now

consider the following "useful guideposts" provided in Hudson to

determine whether the statutory scheme is punitive in either

purpose or effect:

> (1) "[w]hether the sanction involves an affirmative
> disability or restraint"; (2) "whether it has
> historically been regarded as a punishment"; (3)
> "whether it comes into play only on a finding of
> scienter"; (4) "whether its operation will promote the
> traditional aims of punishment--retribution and
> deterrence"; (5) "whether the behavior to which it
> applies is already a crime"; (6) "whether an
> alternative purpose to which it may rationally be
> connected is assignable for it"; and (7) "whether it
> appears excessive in relation to the alternative
> purpose assigned."

Hudson v. United States, supra at 99-100 (quoting Kennedy v.

Mendoza-Martinez, 372 U.S. 144, 168-169 (1963)).  These factors

are to be considered in relation to the "statute on its face",
and "only the clearest proof" will suffice to override
legislative intent that a remedy be civil in nature.  Id. at 100.

After considering the "guidepost" factors, we hold that the
accuracy-related penalty for negligence and/or the civil tax
liability on the forfeited espionage income are not so punitive
as to overcome clear congressional intent that they be civil
rather than criminal in nature.  The imposition of a tax
liability, or a civil tax penalty, does not amount to an
affirmative disability or restraint, nor has it historically been
regarded as punishment.  See Louis v. Commissioner, 170 F.3d at
1235 (for penalties); Murillo v. Commissioner, T.C. Memo. 1998-13
(for tax liability).  The Court of Appeals for the Ninth Circuit
has applied the Hudson test in Louis and held that the addition
to tax for fraud and its purpose were remedial.[11]  Louis v.
Commissioner, supra.  The fraud penalties "are provided primarily
as a safeguard for the protection of the revenue and to reimburse

----

[11] The Court of Appeals for the Ninth Circuit, in holding
that the civil fraud penalty was not punitive within the meaning
of Hudson v. United States, 522 U.S. 93 (1997), noted that the
civil fraud penalty contained some of the guideposts, such as
intent.  See Louis v. Commissioner, 170 F.3d 1232, 1235-1237 (9th
Cir. 1999), affg. per curiam T.C. Memo. 1996-257.  In that
regard, the negligence penalty does not require specific intent
and thus has less coincidence with the guideposts.  In addition,
the negligence penalty is 20 percent of the affected portion of
the underpayment, whereas the fraud penalty is 75 percent of the
same portion.

the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." Helvering v. Mitchell, supra at 401 (fn. ref. omitted). A fortiori, if the fraud penalties are not a criminal punishment, the civil negligence addition to tax and the tax liability are not a criminal punishment. The imposition of a Federal income tax liability is remedial and not a punishment. See Ianniello v. Commissioner, 98 T.C. 165, 180 (1992).

We hold that the imposition of a tax liability on petitioner's espionage income and/or the imposition of an accuracy-related penalty under section 6662(a) does not constitute punishment within the meaning of the Double Jeopardy Clause.[12]

Decision will be entered

for respondent.

---

[12] The opinions of this Court are replete with factual situations where taxpayers who were not the subject of criminal tax proceedings were found liable for tax and additions to tax on unreported income from legal and illegal sources. Here, petitioner is not being subjected to a greater tax rate or exposure than any other taxpayer, irrespective of whether said taxpayer had been subjected to criminal prosecution prior to a determination of a civil liability.