GEORGE R. A. JOHNS AND BEVERLY M. JOHNS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johns v. Commissioner
Docket No. 12827-84.
United States Tax Court
T.C. Memo 1987-163; 1987 Tax Ct. Memo LEXIS 159; 53 T.C.M. (CCH) 442; T.C.M. (RIA) 87163; March 26, 1987. *159 J entered into a sale-leaseback transaction with P-R, L-B and J&P, related corporations, involving collapsible containers for the transportation of plants. On the facts, held, the transaction lacked business purpose and economic substance. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89 (4th Cir. 1985), affg. and revg. 81 T.C. 184 (1983). Held further, substantial underpayment attributable to tax motivated transaction determined. Sec. 6621(c), I.R.C. 1986, applies. *160 Michael E. Cozine, for the petitioners. Edward G. Martoglio and Marian L. Cannell, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency of $9,179.02 in petitioners' 1980 Federal income tax. The issues for decision are: (1) Whether the container leasing activity of petitioner George R. A. Johns (petitioner) [1] is devoid of economic substance and should therefore be disregarded for Federal income tax purposes; (2) Whether petitioner's container leasing activity lacks profit motive within the meaning of section 183; [2]
(3) Whether the purchase price of the containers greatly exceeded their fair market value; (4) Whether the limited recourse purchase note is includable in the basis of the assets for depreciation purposes; (5) Whether petitioner was at risk within the meaning of *161 section 465 with respect to the amount of the indebtedness; and (6) Whether petitioner substantially underpaid tax in the years in issue as a result of a tax motivated transaction within the meaning of section 6621(c) (formerly section 6621(d)). *162 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time of the filing of the petition, petitioners resided in New Jersey. Petitioners timely filed their joint Federal income tax return for the calendar year 1980. George R. A. Johns (petitioner) was an architect. Pursuant to an offering memorandum for the sale and leaseback of 35 units of 25 Pak-Rak collapsible containers by Pak-Rak, Inc. (Seller), petitioner (as Owner) entered into an agreement dated December 29, 1980, with Seller to purchase 25 collapsible shipping containers (Pak-Raks) to be used to transport plants and sundry horticultural items. The container was designed to eliminate the need for disposable cardboard packaging for transporting the plants by truck. As part of the same transaction, petitioner also entered into a management agreement with Little Brownie Properties, Inc. (Manager) and a lease with J&P Properties, Inc. (Lessee, also hereinafter sometimes referred to as J&P). Manager contracted to oversee and conduct the business of equipment renting on behalf of petitioner as Owner. *163 Manager's services were to include soliciting users and lessees through advertising and promotion, collecting rent and paying operating expenses, providing Owner with financial reports and marketing containers at the termination of the lease. Manager had a 10 percent interest in the residual value of the containers. Pursuant to the management agreement, Manager was to receive a management fee of $2,190 in 1980, $5,522 in 1981, $6,612 in 1982 and thereafter 14.4 percent of gross income. Lessee was an I.C.C. licensed common carrier, carrying horticultural products, particularly live tropical plants, from Florida to points throughout the United States and Canada. The initial lease was for a period commencing on the closing date, December 29, 1980, and continuing to December 31, 1981, the rental to be at a rate of $91.66 per month through December 31, 1980, and $575 per month through December 31, 1981. A successor lease for a period commencing on January 1, 1982, and continuing to December 31, 1985, was entered into on December 16, 1981. Rents payable under the successor lease were as follows: 1982
$7,825
1983
14,970
1984
16,165
1985
17,460
The initial lease *164 was an operating lease, petitioner as Owner-Lessor being obligated to pay the operating expenses. The lease for years after 1982 was a net lease. While the cash flow projections of the Pak-Rak offering memorandum contemplate a 10-year lease, at the time of trial no legally binding or enforceable agreement was in existence between petitioner and any lessee for 1986 and thereafter. Prospective investors in the sale-leaseback offering received the following "projected statement of cash flow:" PAK-RAK, INC.
PROJECTED STATEMENT OF CASH FLOW
10 YEARS - ENDING DECEMBER 31, 1990
UNIT OF 25 CONTAINERS
1980
1981
1982
1983
1984
1985
(3 MOS.)
INCOME
275
6900
7825
18600
20088
21695
CAPITAL CONTRIBUTIONS
* 11750
11325
12625
SALE OF CONTAINERS
TOTAL RECEIPTS
12025
18225
20450
18600
20088
21695
OPERATING EXPENSE
430
1900
1975
2000
2160
2333
MANAGEMENT FEE
691
5522
6612
1033
1116
1205
DATA PROCESSING
600
4000
5000
600
648
700
INTEREST
1659
6638
6638
6402
5739
5075
DWNPMT. ON EQUIPMENT
5000
REPAYMENT OF DEBT
6564
7227
7891
TOTAL EXPENDITURES
8380
18060
20225
16599
16890
17204
DISTRIBUTIONS TO
INVESTOR
75
165
225
2001
3198
4491
*165 PAK-RAK, INC.
PROJECTED STATEMENT OF CASH FLOW
10 YEARS - ENDING DECEMBER 31, 1990
UNIT OF 25 CONTAINERS
1986
1987
1988
1989
1990
TOTAL
INCOME
23431
25306
27330
29516
31878
212844
CAPITAL CONTRIBUTIONS
35700
SALE OF CONTAINERS
7875
7875
TOTAL RECEIPTS
23431
25306
27330
29516
39753
256419
OPERATING EXPENSE
2520
2722
2940
3175
3430
25585
MANAGEMENT FEE
1302
1406
1518
1640
1772
23817
DATA PROCESSING
756
816
881
951
1028
15980
INTEREST
4337
3526
2641
1682
576
44913
DWNPMT. ON EQUIPMENT
5000
REPAYMENT OF DEBT
8629
9440
10325
11284
12390
73750
TOTAL EXPENDITURES
17544
17910
18305
18732
19196
189045
DISTRIBUTIONS TO
INVESTOR
5887
7396
9025
10784
20557
63804
*166 Seller, Manager and Lessee were affiliated companies, in that all three were controlled directly or indirectly by John E. Brown. Petitioner's total stated investment in the transaction was $105,880. This amount consists of the purchase price of $78,750 for a unit of 25 containers, plus management fees and contributions to an operating fund, totaling $27,050. Petitioner made payments and executed notes as follows: (1) $8,180 cash at closing on December 29, 1980; (2) $11,325 "equity promissory note" plus 12 percent interest due April 15, 1981 to Little Brownie Properties, Inc. (Manager); paid with interest of $390.60 at maturity; (3) $12,625 equity promissory note plus 12 percent interest due January 15, 1982, and payable to Little Brownie Properties, Inc.; paid with interest of $1,577 at maturity; and (4) $73,750 limited recourse promissory note plus 9 percent interest per year to be paid to Seller. This note is nonrecourse in the amount of $33,750. The note is stated to be recourse in the amount of $40,000. Payments on the note were structured as follows: a. Interest only at $16.39 per day from date of closing through December 31, 1980; b. Interest only at $491.67 *167 per month from January 1, 1981, through December 31, 1982; c. Principal and interest at $1,080.50 per month from January 1, 1983, for 96 months; d. All principal payments made on the note were to be applied against the recourse portion until that portion of the note had been paid off; and e. In the event that the lease was terminated, or not renewed in 1986, all payments on the note would be deferrable until 1991. At that time, however, unpaid principal and all accrued interest would become due and payable on the note regardless of whether the equipment for the purchase of which it was executed had been leased to J&P or any other lessee as of 1986. The $8,180 cash paid at closing was allocated as follows: (1) $5,000 down payment on the equipment; (2) $2,476 to an operating fund; and (3) $704 for management fees and interest (net of $3 lease income). To reflect the foregoing investments and disbursements related to petitioner's container leasing activity for the years in issue, petitioners reported Schedule C losses on their 1980 and 1981 returns from the activity as follows: 1980
1981 [3]
Rental Income
$ 3.00 $ 6,900.00 Less: Expenses
Management fee
691.00 5,522.00 Investment on equipment note
Recourse portion
8.68 3,600.27 Nonrecourse position
7.32 3,037.73 Operating expenses
1,900.00 Data processing
4,000.00 Depreciation
11,250.00 19,284.00 Total Expenses
($11,957.00)
($37,344.00)
Income (Loss)
($11,954.00)
($30,444.00)
*168 Petitioners also claimed an investment tax credit of $7,875 for the year 1980. The offering memorandum indicates that Pak-Rak's total cost for the equipment, including all indirect costs, is $39,175, derived by totaling the following components: Cost of manufacture of container frames
and 6 shelves per container
$19,375
Identification plates
375
Heating plates
3,125
Freight
375
Stretch wrap machine ($12,000)
300
80 rolls of stretch wrap plastic
3,200
Rust proofing dipping tank ($120,000)
3,000
Accounting advice
500
Broker/dealer fees (if applicable)
3,570
Attorney fees
5,355
Total cost per unit
$39,175
As indicated, the Pak-Rak offering memorandum reflects that Pak-Rak's cost for the equipment included attorney fees of $5,355 per unit. Since Pak-Rak was offering 35 units for sale, the indicated total attorneys' fees would amount to $187,425 if the entire offering was sold. Pak-Rak contracted for the manufacture of the shipping containers by Cornelius Cannon, Inc. (Cannon), a subsidiary of the *169 Cornelius Company. Cannon was first contacted about the development of a shipping container for the plant industry by an employee of the Green Thumb Company in 1978. Cannon developed several prototypes of containers for Green Thumb. Subsequent to this involvement with Green Thumb, Cannon sold containers to J&P. The containers sold to Pak-Rak by Cannon are known as the Gro Cart model. Cannon developed a brochure which describes the Gro Cart. This brochure was incorporated in the Pak-Rak offering memorandum without modification. Cannon sold 780 containers to J&P in 1980 for $265 per container and $20 per shelf. Cannon's list price for containers during 1980 was $291 per container for quantities over 100. Cannon offered a better price to J&P because it required a large quantity of containers. Those sold to J&P are stock items that can be purchased by any purchaser. The containers used in the plant industry are subject to rapid deterioration. They usually hold between 1,000 and 2,000 pounds of plants and related materials. The frames are frequently bent and the casters need frequent replacing. Nurseries often spread liquid fertilizer on the plants while they are on the containers, *170 which causes a rapid deterioration of the container's metal. Pak-Rak does a substantial amount of its business in Florida. The salt in the air resulting from the proximity to the ocean also causes substantial damage to the containers. Pak-Rak never paid Cannon a fee for research and development the company undertook to develop the Gro Cart. Cannon expected to recoup its research and development costs through the sales of the containers. Peter Wood was, at the time of trial, the accountant for Pak-Rak, J&P, Little Brownie and Brown and his wife. According to Wood, the cost of the racks as represented in the offering memorandum was computed by Pak-Rak as follows: racks
$304 per rack X 25
=
$ 7,600
shelves
$28 per shelf X 150
=
4,200
sales tax
$20 per rack X 25
=
500
installation charge
$100 per rack X 25
=
2,500
interest cost
$185 per rack X 25
=
4,625
TOTAL
$19,425
No written documentation or other evidence was produced to substantiate the $4,625 interest cost calculated by Wood, which fails to consider that Pak-Rak received a cash payment from each investor. The prospective investors received the following "summary of taxable *171 profit/loss and cumulative benefits:" INVESTMENT IN CONTAINERS
SUMMARY OF TAXABLE PROFIT/LOSS AND
CUMULATIVE BENEFITS
FOR INVESTOR CONTRIBUTING $35,700
TAXABLE
FROM
PROFIT
OPERATIONS
INVESTMENT
YEAR
(LOSS)
(50% BRACKET)
TAX CREDIT
TOTAL
1980
(16069)
8035
7875
15910 1981
(29956)
14978
14978 1982
(25826)
12913
12913 1983
(1025)
513
513 1984
3575 (1788)
(1788)
1985
5532 (2766)
(2766)
1986
7666 (3833)
(3833)
1987
13412 (6706)
(6706)
1988
19350 (9675)
(9675)
1989
22068 (11034)
(11034)
1990
32947 (16474)
(16474)
31674 (15837)
7875
(7962)
INVESTMENT IN CONTAINERS
SUMMARY OF TAXABLE PROFIT/LOSS AND
CUMULATIVE BENEFITS
FOR INVESTOR CONTRIBUTING $35,700
NET CASH
CUMULATIVE
CASH
CASH
PLUS TAX
NET CASH +
YEAR
FLOW
CONTRIBUTED
SAVINGS
TAX SAVINGS
1980
75
* 11750  4235
4235
1981
165
11325
3818
8053
1982
225
12625
513
8566
1983
2001
2514
11080
1984
3198
1410
12490
1985
4491
1725
14215
1986
5887
2054
16269
1987
7396
690
16959
1988
9025
(650)
16309
1989
10784
(250)
16059
1990
20557
4083
20142
63804
35700
20142 *172 OPINION Respondent argues that the container leasing activity of petitioner George R. A. Johns is devoid of economic substance, that it is a "tax sham," that petitioner had no profit motive for entering into the transaction, that petitioner's basis in the equipment cannot exceed the asset's fair market value and that petitioner's amount at risk does not include any of the limited recourse note. Petitioners argue that the characterization of the form of the transaction by the parties to it should be respected so long as petitioner, as owner-lessor, retains significant and genuine attributes of a traditional lessor, citing Frank Lyon Co. v. United States,435 U.S. 561 (1978). The facts as we have found them may *173 be summarized as follows: [4] At all relevant times John E. Brown (Brown) was the principal owner and operator of J&P Properties (J&P), according to his testimony the oldest and largest carrier of tropical plants in the United States. J&P pioneered the standardization of boxing, potting and temperature-controlled movement of tropical plants for all of the United States and Canada. In this connection, J&P utilized a collapsible shipping container called a Pak-Rak, which is the subject of the leasing transaction in this case. At the time of trial J&P had 2,719 Pak-Raks in service. Brown testified that the Pak-Raks were evolved as a result of several years of research and development prior to 1980 (the year before the Court) by the Department of Agriculture at Beltsville, Maryland, and the University of Ohio. J&P was able to purchase Pak-Raks from a subsidiary of the Cornelius Company in 1980 at a quantity discount cost of $265 per cart and $20 per shelf. Brown stated that acquisition of the quantity of Pak-Rak shipping *174 containers required by J&P in 1979 and 1980 necessitated a very substantial capital outlay on its part, at a time when the money market was extremely tight and interest rates were very high. Consequently, Brown decided to finance J&P's Pak-Rak acquisitions by bringing in outside investors, such as petitioner. [5] Brown's plan was implemented as follows: A new corporation called Pak-Rak, Inc. (Pak-Rak) was formed by Brown to serve as the "Seller." Pak-Rak contracted with Cannon for the manufacture of the Pak-Rak collapsible shipping containers. Pak-Rak in turn offered to sell 35 units of 25 containers each to the investors, the closing to take place on or before December 31, 1980. *175 As part of the transaction, each investor was required to enter into a management agreement with Little Brownie Properties, Inc. (Little Brownie) and a lease agreement with J&P. Little Brownie was also a Brown-affiliated corporation, newly formed to facilitate the transaction. Little Brownie's role, for which it was to receive annual payments from investors such as petitioner, was, in the words of the offering memorandum, "the solicitation of customers as users and lessees through advertising and promotion, the collection of rent and the payment of operating expenses, providing the owner with financial reports and remarketing the containers at the termination of any existing lease." The initial lease between petitioner, as Owner-Lessor, and J&P, as Lessee, commenced at closing in December, 1980, and terminated December 31, 1981. The offering memorandum represents that the lease was "structured and negotiated" by Little Brownie. During 1981, an additional lease was entered into between petitioner and J&P for the period 1982 to 1985, inclusive. The offering memorandum states that the total price per investor would be $105,880, consisting of $78,750 for 25 containers and $27,130 *176 for management fees, operating expenses, data processing and interest expense. This cost would be met, first, by an "equity" requirement of $35,700, consisting of $11,750 at closing [6] plus two promissory notes of $11,325 and $12,625 with 12 percent interest payable April 15, 1981, and January 15, 1982, respectively. In addition, the offering memorandum called for "Financing" in the amount of $73,750 over 10 years with interest at 9 percent, payable interest only through December 31, 1982, and thereafter at the rate of $1,080.50 (principal and interest) per month until paid. Forty thousand dollars of the principal was stated to be recourse. Aside from the so-called estimated offeree representative fee of $3,570, which might or might not have been paid, petitioner as investor made three cash or near cash payments totaling $32,130, as follows: $8,180 paid at closing, of which only $5,000 was applied toward the equipment cost and the balance was paid to Little Brownie. $11,325 by recourse note paid to *177 Little Brownie on April 15, 1981. $12,625 by recourse note paid to Little Brownie on January 15, 1982. The payments to Little Brownie were for management fees and to create an "operating expense fund" (including data process and interest). The offering memorandum projects a cash flow of $55,929 [7] over 10 years; an investment credit of $7,875 based on a seven-year useful life; depreciation using ADR, seven-year life, half-year convention, double declining balance from 1980 through 1983, then switching to straight line; and a residual value of $7,875 based upon 10 percent of the purchase price. Upon disposal of the equipment, 90 percent of the proceeds was to go to the investor and 10 percent to Little Brownie as Manager. Notwithstanding the 10-year projections used in the offering memorandum, there was credible testimony at the trial that containers in use in the plant cart industry are subjected to very substantial wear and tear, and that after two or three years' use the *178 carts require extensive and difficult to obtain refurbishing, creating the inference that acquisition of new equipment at that point would be more practical. A witness employed by the manufacturer and supplier of the equipment stated that his employer had little or no interest in furnishing reconditioning services. All of this testimony tends to place in serious doubt the likelihood of there being anything like a 10-year cash flow from this project. While petitioner argues that the facts of this case should be measured against the significant and genuine attributes of a traditional lessor test of Frank Lyon Co. v. United States,supra, we think it more appropriate to analyze these facts against the standards applied in Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). We view the significant and genuine attributes test articulated by the Supreme Court in Frank Lyon essentially as requiring the determination of tax ownership. Under Frank Lyon, if there is *179 a genuine multi-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, then the taxpayer as lessor also has sufficient ownership to entitle him to the tax benefits of depreciation and, in some cases, the investment credit. If not, then these benefits go to someone else. The question of tax ownership is the question on which our decision turned, for example, in Estate of Thomas v. Commissioner,84 T.C. 412, 431 (1985). After analyzing the transaction in Estate of Thomas we found that "there is no basis for concluding that the lessees acquired an equity in the instant equipment." 84 T.C. at 434. That is to say, we found that tax ownership coincided with legal title. On the other hand, in Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1236 (1981), where we were required to determine whether the transactions under scrutiny were "bona fide arm's-length sales for Federal income tax purposes, or whether they lacked the commercial, legal, and economic substance of sales," we found that the benefits and burdens of ownership had not passed to the taxpayers so as to entitle *180 them to expected tax benefits. In our view, the community of interest between Brown, J&P, Little Brownie and Pak-Rak, Inc., and their respective roles as promoter, lessee, manager and seller, casts serious doubt that the "genuine multi-party transaction" test of Frank Lyon, referred to above, could ever have been met under the facts of this case. In resolving the question of tax ownership, we think the answer lies in a determination of whether anything of substance was to be realized by petitioners beyond tax credits and deductions. Asked another way, can petitioner demonstrate any significant nontax business or investment purpose? See Knetsch v. United States,364 U.S. 361 (1960). We recognize that the tax benefits of which petitioners seek to take advantage may be of the type which in general are Congressionally approved. See Fox v. Commissioner,82 T.C. 1001, 1021 (1984). [8] Unquestionably, sales and leasebacks of the type validated in Estate of Thomas, for example, would lack economic viability without the availability of Congressionally *181 intended tax benefits. The availability of these benefits in certain contexts does not, however, end our inquiry. To support his argument that petitioner's container leasing activity lacks economic substance, respondent applies Rice's Toyota. Respondent points out that in Rice's Toyota this Court developed two approaches to the analysis of equipment leasing transactions, applying essentially a subjective, or business purpose, test and an objective, or economic substance, test. The combined application of these two tests is extensively explicated in Packard v. Commissioner,85 T.C. 397, 417-418 (1985). As stated by the Circuit Court, the business purpose inquiry simply concerns the motives of the taxpayer in entering the transaction. 752 F.2d at 92. If the petitioner's sole motivation for purchasing and leasing back depreciable equipment, such as the Pak-Raks in this case, under the financing arrangement used, was to achieve the large tax *182 deductions that the transaction provided in the early years of the leases, then the transaction lacked a business purpose. In affirming this Court in part and reversing in part in Rice's Toyota, the appeals court applied objective criteria to determine the taxpayer's subjective business purpose. The four criteria applied in that case are also highly relevant here. These are: 1. Whether the equipment would have sufficient residual value at the end of the lease term to enable petitioner to earn a profit on its purchase and seller-financed leaseback; 2. Whether the promotional material emphasized the large tax deductions which the transaction would produce, not the potential for profit; 3. Whether petitioner paid an obviously inflated purchase price for the equipment; and 4. Whether the equipment was purchased mainly with nonrecourse debt, so as to support the inference that petitioner intended to abandon the transaction down the road by walking away from the nonrecourse note balance before the transaction ran its stated course. We do not believe that an extended discussion *183 is required to demonstrate that, under the foregoing criteria, petitioner's transaction taken as a whole lacked both a business purpose and economic substance. Petitioners posit a residual value for the equipment of $7,875 at the end of 10 years, based upon the assumption (a series of "Assumptions" was distributed to the investors as promotional material) that the "life of the investment will be 10 years." The promoter projected a net cash flow of $20,142 to each investor by the end of the 10-year period. To reach this goal, rental income was projected to total $212,844. As the stipulated projected statement of cash flow reveals, in the years 1986 through 1990 the rents would have to be $23,431, $25,306, $27,330, $29,516 and $31,878 for these respective years in order to achieve the projected goal. But as respondent points out on brief, in 1985 when the purchased equipment was already five years old, comparable new equipment could have been bought for a maximum cost of $13,000 to $14,000, rendering it almost inconceivable that such substantial amounts could be received as rent for badly worn and heavily corroded equipment such as petitioner's. There is convincing evidence *184 in this case that the equipment was subjected to severe wear and tear through rough usage and deterioration through chemical corrosion and excessive exposure to salty moisture and the elements. The parties are in agreement that under the ADR depreciation approach, this type of equipment is depreciated on the basis of a five to seven-year use life. There is, on the other hand, no scintilla of any evidence to support a 10-year actual use of the equipment. The offering memorandum contains the usual disclaimers about suitability for only those persons who can sustain a loss on the investment, have no need of liquidity, can bear the economic risk for an indefinite period of time, etc. -- all no doubt intended to mollify the strict standards of the securities regulator. After pages of discussion unlikely to be read seriously by anyone other than the securities regulator and the tax collector, the offering memorandum contains, on one page, the heart of the proposal: the summary of the expected tax savings and a projected cash flow. The objectives of the projection of expected tax savings are obvious. In the first three years, 1980, 1981 and 1982, the years in which the dramatic tax *185 savings were expected, they were programmed to be as follows: Tax Savings
From Operations
(50 percent
Investment
bracket)
Tax Credit
1980
$ 8,035
$7,875
1981
14,978
1982
12,913
Totals
$35,926
$7,875
$43,801
Comparing petitioner's cost of investment with expected tax savings, the results for the first three years were expected to be as follows: Cash Invested
Tax Saved
Gain
1980
$8,180
$15,910 $ 7,730
1981
11,325
14,978
3,653
1982
12,625
12,913
288
Total saved through
$11,671
tax benefits
The objective of the projected net cash flow was also obvious, since not even the most avid tax shelterer could be expected to sit still for an overall negative cash flow. Through what can most charitably be described as incorrigible optimism, the promoter's projected summary of cumulative benefits projects a bottom line "net cash plus tax savings" of $20,142. In many ways the most convincing evidence of the lack of business purpose and economic substance in this case, as in many tax shelter cases, is the inflated purchase price for the equipment. The purchase price here consisted of a $5,000 *186 cash down payment and a $73,750 note. The claimed cost of the manufacture of the containers and shelves is $19,375. The containers acquired are identical to a container called Gro Cart manufactured and sold by Cannon Equipment Co. Ronald Rosa was the engineer for Cannon involved in the design and marketing of the containers at issue. Rosa testified that the containers sold to Brown are identical to those sold by Cannon to other customers. In fact, at the time of trial Cannon had sold approximately 10,000 of these containers to others than J&P and its affiliates. Brown testified that the containers which he purchased are identical to those routinely sold by Cannon. The Gro Cart described in the brochure prepared by Cannon is identical to the Pak-Rak as presented in the Pak-Rak offering memorandum. Thus, the containers in the hands of J&P and petitioner are in no way unique. The amount actually paid by Brown for the containers which he purchased in 1980 was $265 per container and $20 per shelf. Twenty-five containers and 150 shelves at those rates would thus cost $9,625. The total cost of $19,375 indicated in the offering memorandum is thus overstated by more than 200 percent. *187 At trial, the promoter's accountant, Wood, attempted to support the claimed cost for the equipment by indicating that the cost includes an interest component of approximately $185 per container. Not only is this claim completely unsupported by any documentation, but the offering memorandum makes no reference whatsoever to any interest charges as a part of Pak-Rak's cost of acquiring the containers from the manufacturer. Respondent notes that although a discount was available to Brown or J&P for quantity purchases of the Pak-Raks, based upon Rosa's testimony, any person could have purchased 25 or more containers for a total cost of not more than $12,000. As stated, the promoter claims a manufactured cost of the containers and shelves of $19,375. The promoter attempted to build up additional costs by including some further items, explaining that some of the overall component costs were allocated to each unit where the item of cost was not direct. The record contains no credible evidence that these items were ever acquired, or whether, or to what extent certain intangible costs were incurred. These apparently phantom additional costs are: Identification plates
$ 375
Heating plates
3,125
Freight
375
Allocated cost of stretch wrap machine ($12,000)
300
80 rolls of stretch wrap plastic
3,200
Allocated cost of rust proofing dipping tank ($120,000)
3,000
Accounting advice
500
Broker/dealer fees (if applicable)
3,570
Attorneys fees
5,355
Total additional costs to seller
$19,800
*188 When the "total additional costs to seller" are added to the claimed manufacturing costs of $19,375, the grand total cost to seller is represented to be $39,175. The record contains no credible evidence that any of the additional costs, including the broker/dealer fees and attorneys fees, were actually incurred or paid by Pak-Rak, Inc., Brown or J&P. Of the $32,130 cash paid by each investor, $5,000 was applied toward the $78,750 purchase price for the equipment, and the balance, $27,130, was applied: $12,825 as a management fee to Little Brownie, and $14,305 toward an "operating fund" which was to include operating expenses, data processing and interest through December 31, 1982. The management fee was scheduled to be applied as follows: $691 in 1980, $5,522 in 1981 and $6,612 in 1982. Thereafter, an annual management fee of between $1,000 and $2,000 (in varying amounts for each projected year through 1990) was payable annually. Petitioner offered no explanation as to the reason for the disportionate size of the fee in 1981 and 1982. No substantiating evidence was produced regarding the operating fund. It is reasonable to surmise that most of petitioner's cash was allocated *189 to the management fee and the operating fund, rather than to the purchase price of the equipment, with the expectation of obtaining early tax deductions. The timing of a substantial part of the payments coincided with certain tax payment dates, April 15, 1981, and January 15, 1982. As already noted, the equipment was for the most part purchased with debt. We agree with respondent that the entire amount of the debt was nonrecourse and was not genuine indebtedness, notwithstanding that $40,000 of the $73,750 note was declared to be "with recourse." The document creating the indebtedness is entitled "Limited Recourse Promissory Note -- Security Agreement." Section 4.3 provides: 4.3 Limited Recourse.
Anything in this Note, the Purchase Agreement or any other instrument or document executed in connection with or related to the Collateral or any proceeds to the contrary notwithstanding, except to the extent of the portion of the principal providing recourse against Debtor as set forth at the head of this Note "(Recourse Amount") and interest thereon, Payee agrees to look solely and only to the Collateral for the payment, performance and observance of all of the Obligations, and *190 Payee, for itself and its successors and assigns, except as to the extent of the Recourse Amount, hereby expressly waives any rights to enforce payment or performance by Payor hereunder or to recover damages for any breach of warranty, covenant or agreement of Payor hereunder other than to proceed against the Collateral in the event of any such Event of Default hereunder; provided, however, that Payee may also seek injunctive relief to require Payor to execute and deliver any instrument and document required to be executed and delivered by Payor pursuant to the Obligations. All principal payments shall be first applied to reduce the recourse portion of the principal of this Note and thereafter to reduce the non-recourse amount. Paragraph 3.1 of the Note provides that if the Master Lease is terminated prior to the expiration of the lease term, then payment on the Note will be deferred until 1991. The offering memorandum also states that a similar deferral is available should a lessee not be found at the end of a prior lease. Brown testified that when the lease expired in 1985 he would either enter into a second lease or would buy the investors out by canceling their indebtedness *191 and paying several thousand dollars. If this testimony is truthful, Brown intends or intended to pay approximately $60,000 for containers at a time when they would be 5 years old. Based upon 1980 cost figures, identical new racks could presumably be purchased from the Cannon Company a few years later for an amount in the neighborhood of $13,000 to $14,000, giving effect to inflation. Brown's testimony makes sense only if the limited recourse note is considered to be, in substance, a nonrecourse note. Furthermore, petitioner's ready willingness to pay an obviously inflated purchase price for the equipment bespeaks a state of mind on his part that no part of the Note represented his own personal indebtedness. Nothing in the record attempts to explain the rationale or justification for the "limited recourse" portion of the Note. We accordingly supply the rationale: that it is a rather transparent attempt to make an end run around the "at risk" provisions of section 465. Regardless of the label applied, for all of the foregoing reasons we deem the net effect of the entire Note to be nonrecourse. In Rice's Toyota, the Fourth Circuit held that because the taxpayer paid an obviously *192 inflated purchase price for leased equipment and financed the purchase price mainly with nonrecourse debt, it was properly inferable by the Tax Court that the taxpayer intended to abandon the transaction down the road by walking away from the nonrecourse note balance before the transaction ran its stated course. 752 F.2d at 93. We think the record justifies the same inference here. The Summary of Taxable Profit/Loss and Cumulative Benefits schedule projects positive taxable income from the transaction beginning in 1984. While the projected rent payments were, we believe, artificially rigged to project positive cash flow in all years except for de minimis amounts of $650 in 1988 and $250 in 1989, petitioner's taxable income from the transaction would begin in 1984 and run through 1990 without any assurance, due to the lease expiration, that any cash would be forthcoming for tax payments. The evidence is strong that the equipment would be badly deteriorated after two or three years' use, and Brown's testimony is strongly indicative of an intent to sign off on the transaction, rather than renew the lease, by loan forgiveness and payment of a few thousand dollars. We *193 therefore think highly probable the likelihood of petitioner's eventual abandonment of the transaction so as to avoid phantom taxable income. Based upon the foregoing analysis, we conclude that petitioner's Pak-Rak transaction lacked both business purpose and economic substance and was motivated solely to obtain unwarranted tax benefits. In effect, then, petitioner simply paid Pak-Rak, Inc. a $32,130 cash fee to obtain tax benefits. Rice's Toyota World Inc. v. Commissioner,752 F.2d at 91. In addition, since the entire Pak-Rak transaction lacked economic substance, neither the $73,750 promissory note nor the $5,000 in cash may be included in basis, since neither was used to acquire an asset. Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 210 (1983), affd. on this issue, revd. in part 752 F.2d 89 (4th Cir. 1985); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981). Furthermore, an interest deduction in the amount of $16 claimed by petitioners on their 1980 return based on the nonrecourse indebtedness is unallowable. Respondent argues that petitioner was not at risk under section 465 *194 for any amount of the so-called limited recourse note because no part of the note was truly recourse. Since we have held that the entire Pak-Rak transaction lacked economic substance, the limited recourse note did not represent genuine indebtedness and we therefore need not address this issue. Petitioner executed and delivered an "Equity promissory note" in the amount of $11,325 which was paid with interest in the amount of $390.60 on the due date, April 15, 1981. He also executed and delivered an Equity promissory note in the amount of $12,625 which was paid with interest in the amount of $1,577 on the due date, January 15, 1982. While we have held that the transaction for which these notes were issued lacked economic substance, the notes themselves did not lack economic substance. They constituted genuine indebtedness of petitioner and he would therefore be entitled to deduct interest in the amounts of $390.60 and $1,577 in 1981 and 1982, respectively. Rose v. Commissioner, 88 T.C.     (pp. 56-58, Slip Op.) (1987); Rice's Toyota World, Inc. v. Commissisoner,supra, affd. on this issue, revd. in part 752 F.2d at 95-96; section 163(a). At the commencement *195 of the trial of this case respondent moved that the Court determine the portion of the deficiency, if any, for the taxable year 1980 which constitutes a substantial underpayment attributable to a tax motivated transaction for purposes of computing the interest payable with respect to such amount under section 6621(c). [9] The increased interest rate is effective for interest accruing after December 31, 1984, regardless of the filing date of the return. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). See also DeMartino v. Commissioner, 88 T.C.     (filed March 12, 1987). Section 6621(c)(3)(A) includes in its definition of a tax motivated transaction any valuation overstatement within the meaning of section 6659(c). A valuation overstatement, within the meaning of section 6659(c), has occurred "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis *196 (as the case may be)." *197 On their 1980 return petitioners claimed depreciation and an investment credit based upon an equipment value of $78,750. Our holding that petitioner's Pak-Rak transaction lacked economic substance is determinative that petitioners' basis in the property was zero. As such, a valuation overstatement within the meaning of section 6659(c) has occurred to the extent of the full basis claimed by petitioners, and the underpayments which are attributable to all deductions and credits resulting from the claim of basis in the purchased property are attributable to tax motivated transactions. Further, the 1980 underpayment resulting from such deductions and credits is in excess of $1,000 and is therefore a "substantial underpayment." Helba v. Commissioner,87 T.C. 983 (1986); Zirker v. Commissioner,87 T.C. 970 (1986). Application of the rate provided by section 6621(c) shall be made in the amount of the substantial underpayment determined pursuant to Rule 155 in accordance with Temporary Regulation section 301.6621-2T, Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). To reflect the foregoing, Decision will be entered *198 under Rule 155.
Footnotes
1. Beverly M. Johns is a petitioner here by virtue of filing a joint return with her spouse, George R. A. Johns. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the year in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
*. The total investment includes an estimated offeree representative fee of $3,570. Any fee for an offeree representative's services will be paid directly by the investor and is a matter strictly between the investor and his offeree representative. Such estimated fee is not a part of the purchase price, and is the sole responsibility and obligation of the investor and is not the responsibility or obligation of any other party to this transaction.↩
3. Although the year 1981 is not before the Court, items reported by petitioners on Schedule C for that year are included for completeness.↩
*. The total investment includes an estimated offeree representative fee of $3,570. Any fee for an offeree representative's services will be paid directly by the investor and is a matter strictly between the investor and his offeree representative. Such estimated fee is not a part of the purchase price, and is the sole responsibility and obligation of the investor and is not the responsibility or obligation of any other party to this transaction.↩
4. To the extent that additional facts are found herein which are not included under "Findings of Fact," they are incorporated therein by this reference.↩
5. In Hilton v. Commissioner,74 T.C. 305, 347 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), there was a showing that the sale-leaseback in that case made possible 100 percent financing of the acquisition cost of the lessee's building. In this case, the record contains no data by which to measure the truth of Brown's assertion that the outside investor approach employed here produced more favorable results for J&P from an equipment acquisition standpoint than would have been obtainable through regular borrowing. The excessively inflated purchase price to the investors (discussed infra↩) justifies the inference that selling tax benefits, and not equipment financing, was Brown's principal objective.
6. Of this amount $3,570 was supposedly earmarked as an "estimated offeree representative fee" and was not intended to be included in any amount going to a Brown affiliate.↩
7. The derivation of this number is not clear, since in other materials distributed to the investors net cash plus tax savings is projected at $20,142. On another schedule "cash flow" totals $63,804.↩
8. See Warren, "The Requirement of Economic Profit in Tax Motivated Transactions," 59 TAXES 985↩ (1981).
9. Section 6621(c) provides: (c) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- (1) IN GENERAL. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this section. (2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000. (3) TAX MOTIVATED TRANSACTIONS. -- (A) IN GENERAL. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction. (B) REGULATORY AUTHORITY. -- The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account -- (i) the ratio of tax benefits to cash invested, (ii) the methods of promotion the use of this type of transaction, and (iii) other relevant considerations. (C) EFFECTIVE DATE FOR REGULATIONS. -- Any regulations prescribed under subparagraph (A)(iv) or (B) shall apply only to interest accruing after a date (specified in such regulations) which is after the date on which such regulations are prescribed. (4) JURISDICTION OF TAX COURT. -- In the case of any proceeding in the Tax Court for a redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions.↩