DAVID KRAMER AND ANITA KRAMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kramer v. Commissioner
Docket No. 26249-81.
United States Tax Court
T.C. Memo 1988-475; 1988 Tax Ct. Memo LEXIS 486; 56 T.C.M. (CCH) 378; T.C.M. (RIA) 88475; September 28, 1988. Robert A. Shupack, for the petitioners. James R. Rich, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice of deficiency mailed July 24, 1981, determined income tax deficiencies in petitioners' 1977 and 1978 taxable years in the amounts of $ 17,709 and $ 20,304, respectively. The income tax deficiencies are substantially [1] attributable to respondent's disallowance of petitioners' claimed losses and income tax credits from *487 a truck leasing activity. The issue [2] for our consideration is whether petitioners are entitled to any part of the losses and income tax credits claimed in connection with their truck leasing activity. FINDINGS OF FACT The parties entered into a stipulation and supplemental stipulation of facts, along with exhibits, all of which are incorporated by this reference. Petitioners, who were husband and wife during the taxable years in issue, each resided in Florida at the time they joined together to file their petition in this case. Petitioners filed joint Federal income tax returns for 1977 and 1978 and they did not make elections under section 183(e) [3] for either year regarding their truck leasing activity. Petitioner David Kramer (Kramer) has been a practicing medical *488 doctor in Florida since 1957. Over the period of 20 years, since 1957, Kramer utilized the professional services of Myles Klein (Klein), a Certified Public Accountant (C.P.A.), and Martin Greenberg (Greenberg), a tax attorney. Greenberg was also a C.P.A. and had practiced in 1963 as a C.P.A. prior to his employment as an Internal Revenue Service field agent. In 1968, Greenberg completed law school and left the employment of the Internal Revenue Service to practice law. After 1981, Greenberg ceased active law practice. Klein has been a C.P.A. since 1963 and has practiced in his own business and with a "big eight" accounting firm. Klein's practice was tax oriented and he provided income tax planning and investment analysis for clients. Klein, although not familiar with the values of tractors or trailers and the specialized business practices and economics of the trucking business, had advised clients, prior to Kramer, regarding truck leasing investments. *489 Kramer subscribed to and read business publications and also attended investment seminars sponsored by medical groups. Sometime during 1977, either Klein or Greenberg told Kramer about a sale and leaseback investment with J & P Properties, Inc. (J & P). Greenberg's law firm rendered the tax opinion included as part of the J & P Offering Memorandum (Memo), which was provided to prospective investors. Greenberg provided Kramer with the Memo, which Kramer read and discussed with "truckers" who were his patients. Kramer presented the Memo to Klein to analyze the economic projections, cash flow, residual value of the equipment, and the legality and legitimacy of the agreement. Kramer had several meetings with Greenberg and Klein to discuss the amount of the investment, the risk factors and the financial gain expectations. Klein approved of the J & P investment and projected an economic return based upon the information presented in the Memo. Klein did not conduct an independent investigation of the factual information or assumptions set forth in the Memo. The Memo contained, in pertinent part, the following material information: (1) J & P offered to sell new 1978 Mack Model WS7L2LST *490 tractors and used Fruehauf or Great Dane 45-foot trailers to investors at the combined price of $ 100,000 - $ 75,000 for the tractor and $ 25,000 for the trailer. J & P was to buy the tractors new for $ 62,400 and the used trailers were to be purchased for about $ 17,000. The equipment was to be sold to investors subject to J & P's acquisition debt. The total purchase price, including various fees and expenses, was to be $ 118,000, as reflected by the following source and application of funds: Source of Funds:
Cash contribution - 1977
$  12,500.00
Cash contribution - 1978
15,500.00
Recourse Note
44,354.47
Nonrecourse Note
45,645.53
$ 118,000.00
Application of Funds:
Equipment Purchase
Down Payment
$ 10,000.00
Recourse Note *
44,354.47
Nonrecourse
45,645.53
$ 100,000.00
Management Fee & Expense
2,500.00
Financial Expenses to J & P
5,500.00
Remarketing Fee to J & P
10,000.00
$ 118,000.00
(2) The 12,500 cash contribution was payable at the time of closing the transaction *491 and the $ 15,500, which was represented by a short-term promissory note to J & P, was due February 15, 1978. The recourse and nonrecourse notes, in the amounts of $ 44,354.47 and $ 45,645.53, respectively, were to be secured by the equipment and bore interest at 8.5 percent per annum. The recourse and nonrecourse notes were payable in 60 monthly payments of principal and interest totaling $ 910 and $ 690, respectively. After 60 months the remaining balance on the nonrecourse note was payable at the rate of $ 1,600 per month until fully paid. (3) The investor was to enter into a 17-month lease of the equipment and J & P (lessee) was to pay a $ 35,000 minimum annual rental, plus 35 cents per mile for every "loaded mile" over 100,000 per lease year. The investor was responsible for fuel, license, prorates, start-up expenses and debt service. These expenses were to be paid from rental income and the investor's capital contribution. All other expenses were to be paid by J & P, including supplies, wages and benefits, insurance, terminal charges, brokerage charges and maintenance. Although the Memo indicated that J & P would pay terminal charges, other sample documents attached to *492 the Memo indicated that the investor would pay the terminal charges. (4) The investor was to enter into a 17-month management contract with Transportation Systems, Inc. (Transportation), to be formed as a Florida corporation for that purpose. Transportation was to receive fees of $ 970 annually. (5) The investor was to enter into a "remarketing agreement" and pay $ 10,000 and J & P would seek a new lessee after the 17-month lease expired. J & P would return 50 percent of the fee if it was unable to find a lessee upon terms favorable to the investor. Under the agreement, J & P also was to undertake to sell the equipment for 10 percent of the selling price. (6) The economic benefits to the investor included income tax deferral, residual proceeds from sale and lease of the equipment and cash flow. Based upon a $ 28,000 cash investment, projected benefits over a 9-year period included operating losses totaling $ 73,028 over the first 3 years, operating profits of $ 97,516 over the next 6 years and a $ 4,167 investment tax credit in the first year. Cumulative net cash flow plus tax savings to a taxpayer in the 50-percent rate bracket over the 9 years was projected at $ 15,650. *493 Cash flow was projected at $ 600 per year for the second through the sixth year. Projections for the final 3-year cash flow were shown at $ 3,799, $ 19,800 and $ 25,128, respectively. The "cash on cash" return was projected at $ 51,727 on an investment of $ 28,000 over about an 8-year period. (7) The economic projections were based on various assumptions. Some of the major assumptions were. (a) The equipment would be operated for 8 years; (b) it would travel at least 100,000 miles per year; (c) mileage over 100,000 would generate rental income at 35 cents per mile; (d) truck fuel would be consumed at a rate of 5 miles per gallon and would sell for 60 cents per gallon; (e) remarketing fees would be $ 10,000, in 1978; (f) the equipment would be sold in 1985 for $ 10,000, less a 10-percent commission, and (g) the new lease after the initial 17-month term would be at the same terms or rates. Based upon industry experience and standards, the life expectancy of a tractor was between 400,000 and 500,000 miles or from 30 to 48 months of operation. The lease rental payments in the projections were based upon "loaded map miles," whereas the actual mileage of the tractor would include *494 unloaded and uncompensated mileage thereby limiting useful mileage and potential for profit during the life of the vehicle. J & P, a family owned and operated business, is a Florida corporation that has engaged in the business of hauling tropical plants throughout the United States since 1959. John E. Brown (Brown), the founder of the business, has been in the transportation business for 37 years. At the time of trial, J & P operated 135 tractors and 1,000 trailers. The business services about 200 nurseries in the State of Florida and ships their plants to all parts of the United States to retail businesses, such as Zayre, K-Mark, Montgomery Ward, etc. Due to a combination of increased competition and trucking industry deregulation, Brown was forced to seek alternative means of financing or capitalizing his trucking operation. The sale and leaseback approach, as described in the Memo, was the method that Brown chose to generate capital for his business. J & P uses refrigerated, heated and specially equipped trailers designed and sometimes modified to haul plants and other delicate items. J & P had a policy of servicing its trucks after each trip. Following a review of the *495 Memo and the stated risks and benefits, Klein advised Kramer that the investment had reasonable economic potential. The risks considered by Kramer included personal liability on the recourse note, loss of his cash investment and the possibility that the Internal Revenue Service would not allow investment tax credits and the losses claimed in early years. Kramer believed there was a reasonable potential for profit, but did not verify or investigate the underlying facts or assumptions. After negotiations with Greenberg to reduce the cash investment from $ 28,000 to $ 25,200, Kramer invested and the deal was closed on December 21, 1977. No explanation was provided as to why Kramer offered less or why Brown was willing to accept less than the amount stated in the pro forma materials. Nor was the allocation amongst the various fees, expenses, etc., of the $ 2,800 (10 percent) difference explained by the parties. Kramer paid a $ 12,658 down payment by check on December 21, 1977. The remainder of the cash price, evidenced by a $ 15,500 note which had the stated amount crossed out and $ 12,700 substituted in accord with negotiations for reduction of the cash investment, was paid by *496 Kramer on February 9, 1978. The Equipment Purchase Agreement, executed as part of the closing documents, provided that Kramer receive ownership of a 1978 Mack Tractor, serial number 10238, and a used 1973 Great Dane Trailer, serial number 60355. Although the transaction was predicated upon Kramer's receipt of title to the equipment, it was not received by Kramer or recorded or registered in Kramer's name with the State of Florida. The records of the State of Florida reflected that "Kramer's equipment" remained in J & P's name and that J & P used it (after the purported sale to Kramer) as collateral for loans unrelated to Kramer's sale and leaseback transaction. Kramer and his accountant (Klein) were not aware (until the time of trial) of this collateralization of the equipment by J & P. Kramer's purchase price was $ 100,000, with a $ 10,000 cash down payment. The recourse and nonrecourse notes were in the amounts and terms as set forth in the Memo. The notes were payable to Flying Angels, Inc., (Angel) a financing arm of J & P. lessee's purchase price was allocated $ 75,000 to the tractor and $ 25,000 to the trailer. The 17-month guaranteed payment lease was for $ 35,000 *497 for the first year and $ 14,583.33 for the succeeding 5 months. Kramer's Management Agreement provided for payments to Transportation of $ 903 upon closing and $ 80.03 per month for the following 17 months. During December 1977, normal financing terms were available for a tractor purchase at interest rates of 12-1/2 to 15 percent for a 48-month period. Loans on trucks for periods exceeding 48 months were not common. The prime rate of interest at that time was 7-3/4 percent. Transportation was a computer bookkeeping service owned and operated by Edward Bender (Bender). Bender had been an employee of Brown prior to operating Transportation. Although Bender styled Transportation as a corporate entity, it appears that he operated it as an alter ego or sole proprietorship. Transportation was not incorporated in Florida. Bender's computer service handled the bookkeeping for 17 investors in J & P equipment sales and leasebacks. Bender received some rent checks from J & P, deposited them through Transportation's bank account, took out his (Bender's) fee and then made payments on the notes to Angel and expenses of truck operation to J & P. Angel, in turn, made the payments to J *498 & P. Although Bender did not retain the canceled checks, he did retain bank statements which did generally reflect that he received and disbursed checks (not necessarily all of them) in amounts approximating relative multiples for about 17 investors. Bender generated computer records reflecting payments to and on behalf of Kramer, which were sent to J & P along with netted remittance. During the years in issue, Bender sent Kramer quarterly and annual computer statements reconciling receipts and payments. Bender discontinued the computer bookkeeping service after January 1981, when J & P acquired a computer and took over the service. On May 31, 1979, Kramer and J & P entered into a new 17-month lease. Under the new terms J & P was to pay 20 cents per mile and J & P would pay all expenses of operation. The new lease did not contain a $ 35,000 or any minimum guaranteed rental payment. On January 1, 1981, and June 1, 1982, Kramer and J & P entered into similar subsequent leases for 21.4 cents per mile, with J & P paying operating expenses. The January 1, 1981, lease, however, denominated a different trailer than prior leases (1975 Great Dane). On December 31, 1979, J & P advised *499 Kramer that his trailer had to be replaced and offered to take back the 1975 Great Dane in exchange for a different trailer. Kramer approved the substitution. The computer records were utilized by Klein in the preparation of Kramer's 1977 and 1978 Federal income tax returns. Klein computed depreciation by assigning a 3-year life to the tractor and utilizing a 200-percent declining balance method. The trailer was assigned a 5-year life and a 150-percent declining balance method was utilized. The "half year convention" was applied. Kramer reported losses and credits from equipment leasing for 1977, 1978 and 1979 in the amounts of $ 32,546 (depreciation and investment tax credit only), $ 45,033 and $ 4,020, respectively. Kramer reported taxable operating profits from leasing for 1980, 1981 and 1982 in the amounts of $ 4,358, $ 11,139 and $ 9,999, respectively. The trailer was sold by Kramer for $ 6,000 during 1982. Kramer sold the tractor during 1983 and reported $ 5,000 sales proceeds and gain. The tractor and trailer were sold for a combined total of $ 11,000, without considering the outstanding balance due on the notes of $ 22,650. Kramer did not report $ 22,650, either *500 as forgiveness of indebtedness or otherwise, in connection with the sale of the equipment. During 1981 and 1982, J & P communicated with Kramer concerning the failure of the rental income to meet expectations and the fact that expenses had exceeded expectations. J & P stated that the variations in expectations were caused by a depressed status in the trucking industry. J & P presented Kramer with offers to sell "Kramer's equipment," which Kramer eventually accepted. At the time of selling the equipment, Kramer was experiencing taxable operating gains, but negative cash flow because of the debt service. he manufacturer's suggested list price for the tractor purchased by Kramer was $ 48,077. That price does not include additional equipment that may be added by the buyer. The industry standard was to add $ 8,000 to $ 10,000 worth of additional equipment. No modifications were shown to have been made to the tractor sold to Kramer. J & P paid $ 38,150, without modifications, for the tractor sold to Kramer. J & P's purchase price was lower than manufacturer's suggested list price partly because of the volume purchasing power of J & P. The fair market value of a single tractor *501 at the time it was sold to Kramer was $ 48,000. A used 1973, 45-foot Great Dane refrigerated trailer, without special modifications, had a value of $ 10,000 during 1977. The Great Dane refrigerated trailer sold to Kramer did not have any special modifications. The 1985 residual value of the equipment in issue was $ 12,000. The terms of the sale and leaseback between Kramer and J & P are abnormal when compared to the usual trucking industry transactions during the same period. The Kramer-J & P terms had lower interest rates, longer repayment period, a larger purchase price, and less favorable terms to both lessor and lessee. The useful life of the equipment in question was less than 8 years from 1977 and, depending upon mileage and service policy, had a useful life of about 3 to 5 years. The sale and leaseback transaction between Kramer and J & P lacked business purpose and was void of economic substance and Kramer could not have had a reasonable expectation of making a profit under the terms of the agreement. OPINION Petitioners claimed losses for 1977 and 1978 and investment tax credit (ITC) for 1977 in connection with their purchase and leaseback of a tractor and trailer *502 (truck). Respondent argues that the claimed losses and credit should be disallowed under two theories: (1) Petitioner's tractor/trailer leasing activity was part of a tax avoidance device, was devoid of legitimate business purposes and economic substance, and should be disregarded for tax purposes; [4] and (2) Kramer did not enter into the tractor/trailer leasing transaction with the objective for profit. *503 Our analysis of this sale and leaseback transaction will be accomplished pursuant to, what has become, a substantial body of case law which has established standards to analyze these type transactions. The pattern of analysis that has evolved focuses upon three aspects to evaluate the transaction for its effect for purposes of Federal taxation. The three aspects to be considered are: (1) Economic substance; (2) benefits and burdens of ownership; and (3) profit objective. The parties in this case have addressed this transaction in a traditional mode and have "played-out" their roles in accord with the pattern reflected in the case law. There is no dispute about interpretation of the cases or statute. This controversy is purely factual. Economic Substance
Generally, the form of a leasing transaction will be respected where the lessor retains significant and genuine attributes of a "traditional" leasing transaction. Frank Lyon Co. v. United States,432 U.S. 561, 585 (1978); Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985). The existence *504 of tax benefits available for the investor does not automatically taint a transaction and it may be found to have economic substance. Frank Lyon Co. v. United States, supra at 581; Packard v. Commissioner,85 T.C. 397, 417 (1985); Estate of Thomas v. Commissioner, supra at 432. When, however, a transaction has no economic purpose other than to obtain tax benefits, the form of the transaction may be disregarded. Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 195 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243-1244 (1981). The parties have referenced numerous cases involving sales and leasebacks. Petitioners' case references were to successful taxpayers and respondent's to unsuccessful taxpayers. The cases relied upon most heavily by the parties include, (with each group in descending order of emphasis): Petitioners - Greenbaum v. Commissioner,T.C. Memo. 1987-222, Gefen v. Commissioner,87 T.C. 1471 (1986); Cooper v. Commissioner,88 T.C. 84 (1987); Southeastern Mail Transport, Inc. v. Commissioner,T.C. Memo. 1987-104, *505 Torres v. Commissioner,88 T.C. 702 (1987); Frank Lyon, Co. v. United States, supra.Respondent - Frank Lyon, Inc. v. United States, supra, Rice's Toyota World, Inc., supra. Petitioners panoptically displayed many cases in which taxpayers were successful in sale and leaseback situations and attempted to draw generalized comparisons to this case. Respondent, on the other hand, limited his analysis to the cases setting the standards and "ran" the facts through the "gauntlet" of the established case law standards. We have reviewed the cases cited by the parties and considered them in our analysis. Respondent bears the burden of proof on his assertion that the overall sale and leaseback transaction was a "sham." [5] Petitioner, however, bears the burden of proving that respondent's determination is otherwise in error. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). In this connection, respondent did determine that the notes totaling $ 90,000 did not have economic substance. Our consideration of business purpose and economic substance is a factual one. Larsen v. Commissioner,89 T.C. 1229 (1987), James v. Commissioner,87 T.C. 905 (1986). *506 In our evaluation of the economic substance of a transaction, the taxpayer's testimony concerning profit objective is relevant, but more weight and emphasis is placed upon objective facts demonstrating a realistic potential for profit. Cherin v. Commissioner,89 T.C. 986, 992 (1987). In this case, petitioner-husband testified that he had general knowledge about investments based upon experience and lectures attended. Additionally, he sought the professional assistance of his accountant and lawyer. He even inquired of "truckers" (presumably truck drivers) who were petitioner's medical patients. Petitioner, his accountant and lawyer and his patients, however, were not well-versed or possessed of any specialized expertise in the trucking business. Petitioner's accountant, who performed a financial analysis and recommended that the leasing transaction was a good investment, did not personally verify the factual underpinnings of the Memo due to a lack of expertise and knowledge. *507 A realistic potential for profit exists "when the transaction is carefully conceived and planned in accordance with standards applicable to the particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment." Cherin v. Commissioner, supra at 992. In the instant case, we conclude that, at the time of "investment," no reasonable possibility for profit existed and petitioner could not have had an actual and honest profit objective. Petitioner has not shown that respondent's determination that the notes lacked economic substance was in error and respondent has carried his burden of showing that the entire transaction lacked business purpose and was devoid of economic substance and should be ignored for Federal income tax purposes. Kramer is an intelligent person who is generally knowledgable about business matters. As a doctor he has conducted a medical practice and has likely purchased various business assets over the years. Although he sought out the advise of his lawyer and accountant, neither of them had any expertise which would qualify them to evaluate the trucking business "factual" assertions or *508 assumptions made in the promotional materials. Kramer also sought the advice of patient-"truckers," but it has not been shown that they possessed appropriate expertise, or what specific advice, if any, they may have provided. Simply, Kramer was not justified in relying upon the advice of his accountant, lawyer and patients because they did not analyze the critical elements and aspects of this transaction. We do not question the quality of Kramer's accountant's analysis of the "numbers," but that the analysis is useless if the underlying "facts" and assumptions are not correct or appropriate. Here, Kramer and J & P entered into a sale and leaseback transaction by means of a $ 10,000 down payment and two promissory notes totaling $ 90,000. One of the notes was designated as a "Secured Non-Recourse Promissory Note" in the amount of $ 45,645.53 and the other as a "Secured Recourse Promissory Note in the amount of $ 44,354.47. Although the "secured" note reflected Angel as payee, no cash, other than the $ 10,000, changed hands. Angel merely executed a note to J & P for the same amount. As payments were made to Angel, the amounts, in turn, would go to J & P. Angel and J & P were *509 both owned by Brown. No reasonable business purpose was given for Angel's being a part of this transaction. We agree with respondent's contention that the existence of Angel in this transaction was "to give the transaction the appearance of being a genuine multi-party transaction." There was no consideration flowing from Angel to Kramer with respect to the secured note. Kramer entered into a lease agreement with J & P and a management agreement with Transportation, each for 17 months. Although Transportation (which was the alter ego of Bender, a former employee of Brown) appeared to keep an independent set of books on behalf of Kramer and other "investors," in reality, Transportation was merely making bookkeeping entries and turning around funds to create the appearance of separate entities. When Transportation (Bender) no longer kept the books, it was done by J & P and Brown. The expenses were being incurred by J & P and the movement of funds through Transportation had no apparent purpose other than for appearances. This change reflects that there was no business of independent need for Transportation other than to create the appearance of separate entities or a "genuine multi-party *510 transaction." Essentially, this transaction [6] was between Kramer and Brown and does not have the "multi-party" type of business environment or transaction described in Frank Lyon Co. v. United States,435 U.S. 561 (1978). The other entities and parties did not play independent and "third party" roles. The prospectus or Memo was designed to reflect the potential for both economic and tax benefits. The potential for economic benefits can be considered reasonable only if the facts and assumptions set forth in the Memo are reasonable, correct or appropriate. Accordingly, in order to determine whether a reasonable *511 or realistic potential for profit existed at the time Kramer invested, we must consider whether the objective facts surrounding the transaction were reasonable, a test which Kramer and his professional advisers did not undertake prior to investment. A "hypothetical reasonable businessman" would look into and/or verify the underlying facts about the trucking industry, truck ownership and leasing before investing in excess of $ 100,000 in such a venture. Cherin v. Commissioner,89 T.C. 986 (1987). The Circuit Court of Appeals for the Fourth Circuit in Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89 (4th Cir. 1985), employed four objective criteria to determine the taxpayer's subjective business purpose, as follows: 1. Whether the promotional material emphasized the large tax deductions which the transaction would produce, not the potential for profit; 2. Whether petitioner paid an obviously inflated purchase price for the equipment; 3. Whether the equipment was purchased mainly with nonrecourse debt, so as to support the inference that petitioner intended to abandon the transaction down the road by walking away from the nonrecourse *512 note balance before the transaction ran its stated course. 4. Whether the cash flow plus the residual value of the equipment at the end of the lease term, less any remarketing or other fees, was sufficient to enable a taxpayer to earn a profit on the purchase and seller-financed leaseback.
Applying these tests we find that this leasing transaction, taken as a whole, lacked business purpose and was without economic substance. Promotional Material
The promotional material (Memo) emphasized that the "investment" was for liquidity or cash flow and bear economic risk for an indefinite period of time. Six times as many pages of the Memo discuss the "tax considerations" than the economic considerations. Only nominal ($ 1,200) amounts of cash flow were projected for early years, whereas (dollar for dollar) tax benefits exceeded the cost investment by more than $ 12,000 during the first 2 years. The cash flow was dependent upon numerous suppositions, which if investigated, would have proven incorrect and/or inflated. Clearly the central focus and centerpiece of the offering materials were the "tax considerations." Purchase Price
J & P purchased the tractor in question *513 for $ 38,150 and concomitantly sold it to Kramer for $ 75,000 (a 75-percent apportionment of the $ 100,000 purchase price for the tractor and trailer). The maximum fair market value of the tractor and trailer was $ 58,000 ($ 48,000 tractor + $ 10,000 trailer) at the time of Kramer's purchase and leaseback with J & P. Although Brown testified that the equipment was usually modified, the record does not support a finding that the equipment in question was, in any way, specially modified. Even if the equipment was specially modified, the modifications would have fallen far short of making up the difference between the market value and the alleged purchase price. Although Kramer has argued that the 17-month guaranteed lease had a value which should be considered in connection with the $ 100,000 purchase price, we can no more properly assign a value to the 17-month guaranteed lease as we can discount the purchase price for the lack of a lessee or guarantee at the conclusion of 17 months. Kramer's argument on this point is nothing more than an afterthought and was not referenced in the Memo or considered as part of the purchase price by the parties to the transaction. Financing - *514 Nonrecourse Debt
The stated financing consisted of two promissory notes totaling $ 90,000. A $ 44,354.47 note was designated "recourse" and a $ 45,645.53 note was designated "nonrecourse." Curiously, the recourse note was payable to Angel, which was not mentioned in the body of the Memo, but was designated as payee on the note in "Schedule B" which was attached to the Memo. Angel did not sell the tractor or trailer to Kramer and we are at a loss to understand Angel's role in this transaction. J & P had purchased the equipment and, at very least, had encumbered the tractor with purchase money debt liens. It is most telling that the amount of the so-called recourse note approximated the cost of the tractor and trailer to J & P. Additionally, the balance between J & P's apparent cost and the $ 100,000 sales price is nonrecourse. This aspect, when considered in conjunction with the 60-month paydown and amortization of the recourse note, places Kramer in a position where he could have walked away from the transaction at any time, because the value of the equipment would likely cover the balance of the recourse note. Cash Flow and Residual Value
The offering materials projected *515 positive cash flow of $ 600 per year for the second through sixth year and $ 3,799, $ 19,800 and $ 25,128 for the final 3 years of the analysis. Due to the high debt service burden generated by the inflated purchase price, no cash flow was ever generated for Kramer. Petitioners claimed $ 32,546, $ 45,033 and $ 4,020 in tax losses and tax credits from the leasing activity for the 1977, 1978 and 1979 taxable years, respectively. Petitioners reported $ 4,358, $ 11,139 and $ 9,999 as taxable operating profits from the leasing activity for the taxable years 1980, 1981 and 1982, respectively. In spite of the operating profits for 3 years, Kramer sold his leasing equipment in late 1982 and early 1983. Is is also illuminating to note that Kramer sold out his interest at a point where the only meaningful cash flow projections were to begin. These circumstances serve to buffer and support respondent's contention that Kramer never intended to hold the property for the economic profit potential, if any, but merely to attain tax benefits and avoid recapture. The assumptions and "factual" statements in the Memo were highly inflated and unreasonable when compared with industry standards and *516 experience. Some of the assumptions were: (a) The equipment would be operated for 8 years; (b) it would travel at least 100,000 loaded map miles per year; (c) mileage over 100,000 loaded map miles would generate rental income at 35 cents per mile; (d) truck fuel would be consumed at a rate of 5 miles per gallon and would sell for 60 cents per gallon; (e) remarketing fees would be $ 10,000, in 1978; (f) the equipment would be sold in 1985 for $ 10,000, less a 10-percent commission, and (g) the new lease after the initial 17-month term would be at the same terms or rates. Based upon industry experience and standards, the life expectancy of a tractor was between 400,000 and 500,000 miles or from 30 to 48 months of operation. The lease rental payments in the projections were based upon "loaded map miles," whereas the actual mileage of the tractor would include unloaded and uncompensated mileage thereby limiting useful mileage and potential for profit during the life of the vehicle. Normal financing terms during 1977 were for 48 months. [7]
*517 Due to the inflated life expectancy of the equipment, Kramer's potential to receive the larger amounts of projected cash flow were only possible if the tractor fortuitously survived beyond the normal useful life of similar equipment. Although not always an exact indicator of actual useful life, for tax reporting purposes the tractor was being depreciated over a 3-year period and the trailer over a 5-year period. The large debt obligation in relation to actual mileage and useful life potential made highly unlikely the generation of cash flow or economic profit without considering tax benefits. The projected 1985 residual value of the equipment was $ 10,000, whereas petitioner reported for income tax purposes that he had sold the equipment for $ 11,000 during 1982 and 1983. Although petitioners did not report the $ 22,650 outstanding balance of the notes as income in 1982 or 1983, they now argue that the $ 22,650 should be considered to reflect part of the residual value of the equipment and that the sale terms in 1982 and 1983 included the $ 22,650 as consideration. We cannot accept petitioners' argument and find that Kramer never intended to pay the nonrecourse note, as evidenced, *518 in part, by his failure to appropriately and properly report the forgiveness of it. Even considered in the best light to petitioners, it was unlikely that they would receive meaningful cash flow or a profit from the residual value of the equipment, considering its projected value, useful life, profit projections, inflated value and the correspondingly inflated debt placed on the equipment. When evaluated under the established standards for sale and leaseback transactions, we find that respondent has carried his burden of showing an overall lack of economic substance and petitioners have failed to show that the notes did not lack economic substance. [8]
*519 Because we have decided that this leasing transaction lacked business purpose and was without economic substance within the meaning of Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 195 (1983), it will not be necessary to analyze whether petitioners held sufficient benefits and burdens of ownership to be regarded as owners for tax purposes or whether they met the rigors of section 183. [9] In any event, petitioners' position on benefits and burdens of ownership is weakened most by their lack of title to the equipment and the fact that Brown used "petitioners' equipment" as collateral for Brown's or J & P's borrowings, which were totally unrelated to the sale and leaseback under consideration. To reflect the foregoing, Decision will be entered for the *520 respondent.
Footnotes
1. The total adjustments for 1977 and 1978 are $ 33,148 and $ 45,268, respectively. All but $ 602 for 1977 and $ 235 for 1978 (which were agreed items) are attributable to respondent's determination to disallow petitioners' claimed losses from truck leasing activity. ↩
2. We previously addressed a procedural issue concerning these petitioners. See Kramer v. Commissioner,89 T.C. 1081↩ (1987). 3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
*. This note represents the assumption of the underlying indebtedness of J & P in acquisition of the equipment. ↩
4. Respondent, in his trial presentation, argued, among other theories, that petitioner's losses and credits should be disallowed because the transaction had no actual or economic substance (commonly known as a "sham argument"). Petitioner, by means of a Motion in Limine, sought to place the burden of proof on respondent on his "sham argument" because respondent's notice of deficiency did not make a "sham" determination. Respondent argued that the language of the notice of deficiency was broad enough to include a "sham" as a reason for disallowance. Respondent also argued that his determination that "the following nonrecourse note lacks economic substance and does not represent a bona fide debt obligation," was sufficient to encompass a "sham" theory for the entire transaction. Although we held that petitioners were not prejudiced by and were timely apprised of respondent's "sham arugument," the statutory notice language disallowing the claimed losses and credit was not sufficiently broad to include the determination that the entire transaction was a "sham" in substance or in fact. Accordingly, respondent bears the burden of showing that the entire transaction is a "sham" and petitioners bear the burden of showing that the nonrecourse note was not a "sham." ↩
5. See note 6, infra,↩ for an explanation for respondent's burden on this part of the issue. 6. Although we make no factual findings based thereon and do not rely upon it in reaching our opinion in this case, it is interesting to note that this Court, in another case, has addressed a similar shelter-type transaction involving Brown. See Johns v. Commissioner,T.C. Memo 1987-163, wherein it was stated that the roles of Brown, J & P and Little Brownie as promoter, lessee and seller cast serious doubt that the "genuine multi-party transaction" test of Frank Lyon Co. v. Commissioner,435 U.S. 561↩ (1978) was met. 7. This industry information was provided by respondent's expert witnesses. Petitioner objected at trial and upon brief to the Court's ruling permitting respondent's expert witnesses to provide expert testimony supplemental to their written report. The supplemental matter about which petitioner had concern was not utilized in reaching our findings or decision. Moreover, Rule 143(f) permits the Court discretion to permit supplementation of an expert's report. ↩
8. The parties did not distinguish between the recourse and nonrecourse notes with respect to any interest deductions that may have been claimed by petitioners. The nonrecourse note was not supported by corresponding value of the underlying assets and the recourse note was to an entity that gave no consideration. Moreover, Kramer did not acquire or register title to the motor vehicles. Accordingly, we need not further address the holding of the Circuit Court of Appeals for the Fourth Circuit concerning the deductibility of interest on the recourse notes involved therein. See Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 95-96↩ (4th Cir. 1985). 9. Petitioners, both before and during trial, moved to "shift the burden of proof" to respondent under the presumption provided for in section 183(d). That matter was disposed of in a separate order and memorandum sur order. Accordingly, there is no need to address it in this opinion because of our finding that the leasing transaction lacked business purpose and was without economic substance. ↩